# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3633

_____

| | | |
|---|---|---|
| Nancy Wever, as Personal Representative of the Estate of Dennis Wever, Deceased, | * * * * | |
| Appellee, | * * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| Lincoln County, Nebraska, | * * | |
| Defendant, | * * | |
| James Carman, Individually and as Lincoln County Sheriff, | * * * | |
| Appellant, | * * | |
| Martin Gutschenritter, Individually and as North Platte Chief of Police; City of North Platte, Nebraska; John Does 1-10; John Does 11-20, | * * * * * | |
| Defendants. | * | |

_____

Submitted: April 15, 2004
Filed: November 4, 2004

_____

Before MORRIS SHEPPARD ARNOLD, MAGILL, and MURPHY, Circuit Judges.

_____

MAGILL, Circuit Judge.

This case arises from the following tragic facts. On December 8, 2001, Lincoln County officers responded to a 911 call from an emotionally despondent Dennis Wever. Though Wever threatened to kill himself if jailed, the officers arrested Wever, brought him to jail, placed him in an isolation cell, and gave him a blanket upon his request. Less than half an hour after making the threat, Wever hung himself with the blanket. He was the third person in five years to commit suicide in the Lincoln County jail.

Wever's mother, acting as his personal representative, brought a § 1983 claim against James Carmen, the sheriff of Lincoln County, and various officers, alleging that his deficient training and supervision of the officers involved in the arrest and incarceration deprived her son of rights under the Fourteenth Amendment. Carmen moved for summary judgment based on qualified immunity and for dismissal for failure to state a claim. The district court denied the motion, holding that the complaint stated a violation of the Fourteenth Amendment and that Carmen had not established he was due qualified immunity. We have jurisdiction to review the district court's denial of qualified immunity pursuant to 28 U.S.C. § 1291, and we affirm. As we discuss below, we lack jurisdiction to review the district court's determination that Wever's complaint states a claim.

Wever called 911 on December 8, 2001 at approximately 3:30 p.m. The 911 call log reveals he was depressed and crying. A number of Lincoln County police officers were dispatched to the home of Wever's father. Upon their arrival, Wever emerged from the home and engaged in a discussion with the officers. The officers were concerned that he was suicidal because of the 911 call and his demeanor upon their arrival. During this discussion, Wever's father returned home and attempted to aid the officers in calming Wever. Various officers' reports reflect that several times during the initial discussion, Wever stated that he was not going to kill himself.

Wever eventually consented to go to a hospital and speak with a doctor. However, for reasons not made clear by the various officers' reports and Carmen's brief, the officers decided instead to arrest him. Carmen alleges only that Wever was arrested "because of his combative and volatile state." Br. of Defendant-Appellant at 8.[1] One of the officers in charge during the arrest, Sergeant Tolle, was similarly vague as to the justification for the arrest, suggesting little more than that Wever was arrested for speech the officers found offensive: "Due to Dennis's yelling obscenities and derogatory remarks and his lack of cooperation and the feeling that without taking action of some sort the problem would only continue I also felt that Dennis needed to be taken into custody." J.A. at 57-58.[2]

Wever offered to go with the police peacefully on the condition that he not be handcuffed. The officers refused, and instead wrestled Wever to the ground and forcibly handcuffed him. During this process, Wever suffered an abrasion to his left cheek. Over the course of the confrontation, he yelled obscenities and threatened the officers.

Upon being arrested and placed in a squad car, Wever kicked out the back window. He was then removed from the car, thrown to the ground, physically subdued, and put in leg chains. Wever's mother alleges that after they had subdued

---

[1] Carmen does not state which Nebraska law this violates.

[2] The arrest form indicates that Wever was arrested for criminal mischief, resisting arrest, and disturbing the peace. J.A. at 66. The first two alleged crimes occurred only *after* the officers decided to arrest Wever—he resisted their attempt to handcuff him and kicked out the window of the police cruiser. Thus, they cannot possibly be the reason for the arrest. It is unclear whether the allegation of disturbing the peace refers to Wever yelling obscenities at the throng of police officers gathering in his father's yard, or the scuffle that ensued when the officers decided to handcuff him. Regardless, reading the record in the light most favorable to Wever, the decision to arrest him was rather thinly supported.

him, the officers continued to beat and kick him while he was on the ground.[3] Officers then placed Wever in another car and took him to a hospital. After being advised of his combative behavior, the responding nurse opted to treat Wever in the squad car. She opined that the injury to his face was merely a scratch and signed a Medical Clearance Report, checking a box accompanied by the following typed, pre-printed text: "I have examined the prisoner and find him/her acceptable for admission to the jail. I have no specific suggestions regarding care of this prisoner *for the condition for which I have examined him/her*." J.A. at 28 (emphasis added). Carmen does not assert that the treating nurse was advised of suicidal threats Wever made at the hospital. More importantly, the record indicates the medical clearance the nurse gave Wever was specifically for the scratch on his cheek.

Until the time he was arrested, Wever told the officers that though he was depressed, he did not intend to kill himself.[4] However, once the officers decided to arrest him, Wever made it clear that he would kill himself if jailed. While waiting in the car at the hospital, Wever stated several times that he would hang or otherwise kill himself if he was taken to jail. According to officer Dowhower, who drove the car, Wever was emphatic in stating that he would kill himself if jailed. Nevertheless, after Wever's cut was examined, Dowhower took Wever to the county jail, where the jailer was advised of Wever's threats. When Wever arrived at the jail, he "made a comment to the [e]ffect of 'now it's time.'" J.A. at 54.

Despite the fact that he had repeatedly threatened suicide, Wever was placed in an isolation unit at about 5:00 p.m. He asked to make a call at approximately 5:08, and was allowed to do so. He was unable to reach the party and asked officer

---

[3]Carmen disputes this allegation.

[4]The 911 call log states that previous to his arrest, Wever told the dispatcher that he was not suicidal. This is supported by the reports of officers Foote and Toelle.

Klingsporn if he could try later. Klingsporn agreed, and returned Wever to the isolation cell, whereupon Wever requested a blanket. Though Klingsporn had been advised by one of the arresting officers only minutes earlier that Wever had threatened suicide, he brought Wever a blanket at approximately 5:14. In a report written after the incident, Klingsporn stated: "I asked him if he promised not to do anything with it except cover himself up. He said he wasn't going to do anything with the blanket. He also joked about there not being anywhere in Iso to hang himself . . . ." J.A. at 61. At approximately 5:30, officer Wilson went to check on Wever and discovered him hanging in his cell by the blanket Klingsporn had provided. Wever had been in the county jail only half an hour after threatening suicide. He was brought to a hospital and pronounced dead.

It is undisputed that Sheriff Carmen took no personal part in the arrest, nor was he present at the jail during the suicide.

Wever's representative sued Carmen in his individual capacity for deliberate indifference to Wever's serious medical needs as a pretrial detainee known to be suicidal. Carmen filed a motion for summary judgment accompanied by only two exhibits spanning a mere three pages: a two-page affidavit signed by Carmen, and a one-page medical form signed by the nurse who examined Wever. His summary judgment motion argued that Wever failed to state a claim and that Carmen was due qualified immunity for the sole reason that he had no personal involvement in the arrest. Absent from Carmen's affidavit is mention of any training given to Lincoln County officers concerning treatment of suicidal inmates; nor does it relate any policy for dealing with suicidal inmates, or when any such policy was implemented. Finally, it omits two prior suicides which occurred at the jail and what, if any, preventive steps may have been taken following those suicides. Carmen's motion and accompanying brief similarly omitted any discussion of liability he may have as a supervisor for inadequate training or supervision of the numerous Lincoln County officers who interacted with Wever shortly before his death.

The district court denied Carmen's meagerly supported motion, construing the complaint to adequately allege a Fourteenth Amendment violation by Carmen, and holding that Carmen was not due summary judgment in large part because he "did not present any evidence showing what training procedures, if any, were in place for handling potentially suicidal detainees or inmates, nor did he present any evidence showing what steps, if any, were taken following" an earlier suicide that had occurred during his tenure as sheriff. Wever v. Lincoln County, Neb., No. 7:02CV05016, 5 (D. Neb. Sept. 24, 2003). Carmen appeals. We affirm the district court.

We review a denial of a summary judgment motion claiming qualified immunity *de novo*, considering it only to the extent it turns on an issue of law. Bankhead v. Knickrehm, 360 F.3d 839, 842-43 (8th Cir. 2004).

In order to determine whether Carmen is due qualified immunity, "we must perform two inquiries in 'proper sequence.'" Coleman v. Parkman, 349 F.3d 534, 537 (8th Cir. 2003) (citation omitted). First, we "must ask whether, when viewed in the light most favorable to the plaintiff, the alleged facts show the official's conduct violates a constitutional right." Id. at 538. If the answer to this question is "yes," then we ask a second question: "'whether the right was clearly established.'" Id. (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)). Only the first inquiry is at issue in this case. As a pretrial detainee, Wever had a clearly established Fourteenth Amendment right to be protected from the known risks of suicide.[5] Yellow Horse v. Pennington

---

[5]Carmen contends on appeal that the district court erred in interpreting Wever's complaint. Essentially, Carmen argues that the district court erred in interpreting Wever's broadly worded complaint to "adequately set forth a Fourteenth Amendment claim against Sheriff Carmen for failure to provide Wever, a pretrial detainee, mental health care." Wever, No. 7:02CV05016 at 2. Though neither party has so argued, we lack jurisdiction to review the district court's interlocutory interpretation of Wever's complaint. This court has jurisdiction over "final decisions" of district courts. 28 U.S.C. § 1291. The district court's decision denying Carmen's motion based on the sufficiency of the pleadings is not final—the claim goes forward. This court does

County, 225 F.3d 923, 927 (8th Cir. 2000).[6]

As the party moving for summary judgment based on qualified immunity, Carmen bears the burden of demonstrating that "no material issues of fact remain as to whether [his] actions were objectively reasonable in light of the law and the information [he] possessed at the time of his actions." Cross v. Des Moines, 965 F.2d 629, 632 (8th Cir. 1992).

In his motion for summary judgment, Carmen argued only that he was due qualified immunity as a matter of law because he had no personal involvement in Wever's arrest. Wever's brief in opposition and Carmen's reply brief, however, addressed supervisory liability. Despite the fact that Carmen did not initially raise

---

have jurisdiction to hear interlocutory appeals from the denial of summary judgment based on qualified immunity. Beck v. Wilson, 377 F.3d 884, 888-89 (8th Cir. 2004). Jurisdiction based on the denial of qualified immunity does not extend to matters that are not "final" unless the two are inextricably intertwined. See Kincade v. City of Blue Springs, 64 F.3d 389, 394-95 (8th Cir. 1995). The district court's construction of the complaint to adequately allege a claim is not inextricably intertwined with the district court's ruling on qualified immunity. See Hafley v. Lohman, 90 F.3d 264, 266 (8th Cir. 1996). We therefore lack jurisdiction to review the district court's construction of the complaint. Because we cannot review the district court's decision, we use its conclusion that Wever adequately set forth a complaint for failure to provide mental health care to a pretrial detainee in our qualified immunity analysis.

[6]While Yellow Horse involved an Eighth Amendment claim, it is well established that pretrial detainees such as Wever are "accorded the due process protections of the Fourteenth Amendment, protections 'at least as great' as those the Eighth Amendment affords a convicted prisoner." Boswell v. Sherburne County, 849 F.2d 1117, 1121 (8th Cir. 1988). We have previously suggested that the burden of showing a constitutional violation is lighter for a pretrial detainee under the Fourteenth Amendment than for a post-conviction prisoner under the Eighth Amendment. Smith v. Copeland, 87 F.3d 265, 268 n.4 (8th Cir. 1996).

any issues of supervisory liability, the district court considered Carmen's liability as a supervisor and held that he was not entitled to qualified immunity as a matter of law.

As for the issue raised by Carmen, it is plain that he cannot be held liable on a theory of *respondeat superior* for any constitutional violations committed by the officers who arrested and jailed Wever. Boyd v. Knox, 47 F.3d 966, 968 (8th Cir. 1995). However, this does not mean that Carmen, to be held liable, must have personally participated in any constitutional deprivation committed by his officers, or must have known about any violation at the time it occurred. Howard v. Adkison, 887 F.2d 134, 138 (8th Cir. 1989) ("Proof of actual knowledge of constitutional violations is not, however, an absolute prerequisite for imposing supervisory liability."). To the extent Carmen suggests otherwise in his motion to dismiss and his brief before this court, he is in error. Rather, a supervisor

> may be held individually liable under § 1983 . . . if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights. The plaintiff must demonstrate that the supervisor was deliberately indifferent to or tacitly authorized the offending acts. This requires a showing that the supervisor had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation.

Andrews v. Fowler, 98 F.3d 1069, 1078 (8th Cir. 1996) (internal citations omitted).

Though Carmen did not contest supervisory liability in his motion for summary judgment, Wever's brief opposing summary judgment raised the issue and Carmen addressed it in his reply brief. Carmen did not, however, include any materials outside the pleadings regarding supervisory liability. The district court considered whether, taking the facts as alleged by Wever, Carmen was immune from supervisory liability as a matter of law. Because Carmen failed to adduce any

-8-

evidence regarding supervisory liability, and put forward his motion before any significant discovery had been undertaken, we will not penalize Wever for possible deficiencies in evidence.[7]  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (requiring "adequate time for discovery"); see also Iverson v. Johnson Gas Appliance Co., 172 F.3d 524, 530 (8th Cir. 1999).  Instead, just as the district court, we will only consider whether, taking Wever's allegations as true, Carmen should be granted qualified immunity as a matter of law.  N. Ark. Med. Ctr. v. Barrett, 962 F.2d 780, 784 (8th Cir. 1992) (recognizing that a summary judgment motion based on the pleadings is the "functional equivalent" of a motion to dismiss).  Carmen raises two arguments against supervisor liability in his brief before this court: First, he disputes that he had the requisite notice that his training procedures and supervision were inadequate; and second, he argues that he had a constitutionally sufficient policy in place.

Wever's complaint alleges that Carmen was aware of two prior suicides in the Lincoln County jail, one occurring in 1999 while he was sheriff, and one occurring in 1996, prior to his tenure.[8]  Carmen argues that as a matter of law, one or two suicides are insufficient to put a sheriff on notice that his training and supervision is constitutionally inadequate.  Under his proposed rule, a sheriff may sit idly by until at least a third inmate known to be suicidal takes a blanket from an officer and hangs himself, only then ordering his officers not to place a suicidal person in an isolation cell and hand him a blanket.  We decline to so hold.

---

[7]The motion was timed before the completion of discovery, and it argued that the plaintiff failed to state a claim and that, taking the allegations in the complaint as true, the defendant was due qualified immunity as a matter of law.  Dist. Ct. Docket Entry 45 (staying discovery until resolution of another defendant's motion for summary judgment).

[8]Though Carmen was not sheriff during the 1996 suicide, Wever's complaint alleges that Carmen was aware of both suicides.  Carmen does not deny he was aware of the 1996 suicide.

We have previously stated that, in most circumstances, a single incident does not provide a supervisor with notice of deficient training or supervision: "[A] single incident, or a series of isolated incidents, *usually* provides an insufficient basis upon which to assign supervisory liability." Howard v. Adkison, 887 F.2d 134, 138 (8th Cir. 1989) (emphasis added). However, as indicated, this calculus is not rigid, and must change depending on the seriousness of the incident and its likelihood of discovery. In Howard, the alleged constitutional violation was caused by an unsanitary cell. Id. at 136. A supervisor is not expected to be put on notice of constitutionally deficient sanitation training by a single instance of a dirty cell. But we cannot equate death with dirty cells. Our case law reflects this flexible calculus. In Andrews, the plaintiff sued a police chief for failing to supervise an officer who ultimately raped two women. 98 F.3d at 1073-74. We held that the chief's knowledge of two prior complaints against the officer for making inappropriate sexual advances to women during traffic stops was sufficient to create an issue of material fact as to notice, rendering summary judgment improper. Id. at 1078. In some circumstances, one or two suicides may be sufficient to put a sheriff on notice that his suicide prevention training needs revision. In the present case, Wever has alleged that Carmen was placed on notice by two previous suicides, and we cannot say this is insufficient as a matter of law.

In the alternative, Carmen asserts that "the jail had a good-faith policy in place for dealing with those prisoners and pretrial detainees presenting suicidal risks. Furthermore, after the September 1999 incident, the policy was implemented for approximately two (2) years before the incident at issue occurred." Br. of Defendant-Appellant at 24 (internal citation omitted). The implication of this statement is that after the 1999 suicide, Carmen implemented a constitutionally adequate suicide policy that was in effect at the time of Wever's suicide. However, this argument is not properly before us. Carmen did not raise it before the district court, and unlike the notice issue, the district court did not delve into it. Ordinarily, this court will not consider arguments raised for the first time on appeal. Orr v. Wal-Mart Stores, Inc.,

297 F.3d 720, 725 (8th Cir. 2002). Nor do the recognized exceptions apply here. Id. ("We consider a newly raised argument only if it is purely legal and requires no additional factual development, or if a manifest injustice would otherwise result."). Moreover, we note that the quoted assertion is entirely without support in the record. The "policy" Carmen cites is a single page offered by *Wever,* and wholly without context. One cannot tell when, how, or even whether it was adopted, why Carmen believed it would adequately respond to the problem of inmate suicide,[9] or how officers were trained to implement it. His assertion that the "policy" was implemented after the 1999 suicide is also unsubstantiated.[10] One cannot discern

_____

[9]The alleged policy states:

For Self-Protection of Inmate. When an inmate's behavior indicates he may injure himself, he will be placed in an isolation cell.

a. Restraints. If the inmate's behavior continues directed toward self destructive behavior, the inmate will be placed in restraints. . . .

b. Observation. The jailer shall observe the inmate on a frequent basis, AT LEAST EVERY FIFTEEN (15) MINUTES. . . .

c. Reporting. The jailer will report the placement of an inmate in isolation and the use of restraints to the Jail Supervisor immediately. The jailer will complete a Record of Restraint Form and prepare an Incident and Discipline Report Form.

J.A. at 68. We note this "policy" would not have prevented the instant suicide, which was not at all unexpected—Wever did exactly what he promised to do shortly after swearing he would do it. The policy does not advise officers against giving suicidal prisoners sheets, blankets, or even ropes should they ask. Moreover, Wever has offered evidence tending to show that placement in isolation cells is overwhelmingly disfavored as a means of monitoring and treating suicidal prisoners. Carmen has not responded to this argument.

[10]Carmen cites an answer to an interrogatory in which he gave no information about the two suicides other than the names of the inmates and the dates on which they occurred. No policy is mentioned. J.A. at 60.

when the "policy" was adopted, and Carmen neglected to make any mention of it in his affidavit in support of his motion for summary judgment. As the district court stated, "Sheriff Carmen did not present any evidence showing what training procedures, if any, were in place for handling potentially suicidal detainees or inmates." Wever v. Lincoln County, Neb., No. 7:02CV05016, 5 (D. Neb. Sept. 24, 2003).[11]

We affirm the decision of the district court denying Carmen qualified immunity.

_____

[11]The fact that the district court considered no policy and held that Carmen had not offered evidence of training serves to strip us of jurisdiction over the issue. Because of the deficiency of evidence, the district court came to no legal conclusion about the adequacy of any training. Our jurisdiction over this appeal extends only to "purely legal determinations made by the district court." Wilson, 260 F.3d at 951. We therefore express no view as to the sufficiency of any evidence that Carmen may be able to present the district court regarding actual notice and adequacy of training in a later motion for summary judgment. See, e.g., Whitford v. Boglino, 63 F.3d 527, 530 (7th Cir. 1995) ("Denial of summary judgment . . . does not establish res judicata.").