# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 05-3766

_____

| | | |
|---|---|---|
| P & O Nedlloyd, Ltd., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| Sanderson Farms, Inc.; Certain | * | |
| Underwriters at Lloyd's of London, | * | |
| | * | |
| Defendants, | * | |
| | * | |
| v. | * | |
| | * | |
| Sanderson Farms, Inc., | * | Appeal from the United States |
| | * | District Court for the |
| Third Party Plaintiff/ | * | Western District of Arkansas. |
| Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Certain Underwriters at Lloyd's | * | |
| of London, Subscribing to Insurance | * | |
| Contract No. MC02ADKH, | * | |
| | * | |
| Third Party Defendant/ | * | |
| Appellee. | * | |

_____

Submitted: April 11, 2006
Filed:   August 30, 2006
_____

Before RILEY, BEAM, and SMITH, Circuit Judges.
_____

RILEY, Circuit Judge.

Sanderson Farms, Inc. (Sanderson), assignee of Sams Management Group, Inc. (SMG) and the real party in interest,[1] appeals the adverse ruling of the district court[2] granting summary judgment in favor of Certain Underwriters at Lloyd's of London (Lloyd's).  We affirm.

## I.    BACKGROUND

The parties adopted the factual summary set out in the district court's order, which we briefly summarize.  At all times relevant, SMG was a frozen poultry wholesaler based in Rogers, Arkansas.  Sanderson was one of SMG's chicken suppliers.  SMG contracted to sell twenty-four containers of frozen poultry (cargo) to KVADRO, a Russian company owned by Leonid Budilin (Budilin).  SMG invoices 199 and 206 contained all the contract terms for the sale.  Both invoices listed the shipment terms as "C.I.F." (cost, insurance, and freight), and the payment terms as

---

[1]During the pendency of this appeal, SMG assigned its rights in this litigation to Sanderson as part of a settlement agreement between Sanderson and SMG. Although Sanderson has been substituted as the real party in interest, we refer to SMG as appellant.

[2]The Honorable Jimm Larry Hendren, Chief Judge, United States District Court for the Western District of Arkansas.

"20% Down Payment," "20% Upon Shipping," and "60% Due 19 days after Discharge."

In connection with its business, SMG acquired a one-year, open cargo insurance policy from Lloyd's (Lloyd's policy), effective February 1, 2002. In accordance with the Lloyd's policy, SMG applied for coverage of the cargo and Lloyd's issued SMG two certificates of insurance. SMG arranged for shipment of the cargo from New Orleans, Louisiana, to St. Petersburg, Russia, through P & O Nedlloyd, Ltd. (P & O), a New Jersey based shipper. P & O shipped the cargo in four separate shipments arriving in St. Petersburg, Russia, on March 3, March 4, March 26, and April 5, 2002.

On March 27, 2002, at KVADRO's request, SMG changed the consignee for the cargo from OOO Diliat to OOO Techpromptorg (Techpromptorg). On April 15, 2002, the Russian government revoked all previously issued veterinary permits for the import of poultry from the United States. Because Techpromptorg had not arranged for customs clearance before the revocation, Techpromptorg had to reapply for the necessary permits. Two months after arriving in port, the cargo still had not cleared customs as required by Russian regulations (sixty-day rule). Techpromptorg applied for an extension of the sixty-day rule based on the Russian government's blanket revocation, but the request was denied. Although Techpromptorg filed an appeal, as of June 17, 2002, Techpromptorg had not received new permits or an extension.

On June 8 and June 18, 2002, Russian Federation Officials of the Baltic Customs House (Russian Federation) issued protocols, seized the cargo, and instituted an investigation into Techpromptorg's apparent sixty-day rule violation. The poultry in fourteen of the twenty-four containers was sold during the pendency of the investigation and the appeal.

The Russian Federation ultimately granted Techpromptorg's request for an extension of the sixty-day rule and also granted judgment in Techpromptorg's favor

on the appeal, ruling the remaining ten containers, as well as the proceeds from the fourteen containers of sold poultry, should be turned over to the poultry owner. Before Techpromptorg picked up the ten remaining containers, the containers were seized anew by Russian authorities as part of a different investigation involving Techpromptorg. Techpromptorg never enforced the judgment it received from the Russian Federation. The ten containers were never returned to SMG or P & O. SMG never received the proceeds from the fourteen containers of sold poultry. SMG never received payment for the cargo and unsuccessfully pursued an action against Budilin and KVADRO.

SMG filed a claim with Lloyd's for recovery of the lost cargo. Lloyd's denied the claim. Thereafter, P & O sued SMG to collect for services rendered in connection with shipping the cargo. SMG filed a counterclaim alleging P & O caused the loss by failing to provide the promised services. SMG also filed a third-party complaint against Lloyd's, seeking recovery of the lost cargo under the Lloyd's policy. P & O amended its complaint, adding a third-party beneficiary claim against Lloyd's. Lloyd's moved for summary judgment, arguing (1) P & O was not an intended third-party beneficiary of the Lloyd's policy, (2) SMG had no insurable interest in the cargo at the time of the loss, (3) the Lloyd's policy did not cover credit risks, and (4) the Lloyd's policy specifically excluded losses arising out of the seizure of insured cargo by customs officials.

Applying Arkansas law,[3] the district court granted Lloyd's motion for summary judgment, finding P & O was not an intended beneficiary of the Lloyd's policy and SMG did not have an insurable interest in the cargo at the time of seizure. The district court did not reach Lloyd's remaining arguments. SMG appeals.[4]

## II. DISCUSSION

We review de novo the district court's grant of summary judgment, applying the same standard as the district court, and viewing the evidence in the light most favorable to SMG, the nonmoving party. See Nitsche v. CEO of Osage Valley Elec. Coop., 446 F.3d 841, 845 (8th Cir. 2006). The moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); see also Bloom v. Metro Heart Group of St. Louis, Inc., 440 F.3d 1025, 1028 (8th Cir. 2006). We

---

[3]The district court did not state its reason for applying Arkansas law, although arguably it did so because Arkansas was the forum state. At appellate arguments, SMG raised the choice of law issue for the first time, arguing the Lloyd's policy is subject to English law. Because choice of law is waived if not timely raised, we need not address the choice of law question for the first time on appeal, Kostelec v. State Farm Fire & Cas. Co., 64 F.3d 1220, 1224 (8th Cir. 1995); see also Wiser v. Wayne Farms, 411 F.3d 923, 926-28 (8th Cir. 2005), and we may consider this appeal under Arkansas law.

[4]After the district court granted summary judgment, P & O moved to withdraw its complaint against SMG. The district court granted the motion and dismissed the case, rendering the district court's order on summary judgment a final judgment, thereby clearing the road for this appeal. See Reinholdson v. Minnesota, 346 F.3d 847, 849 (8th Cir. 2003) (explaining appellate jurisdiction pursuant to 28 U.S.C. § 1291, is limited to appeals from "final decisions of the district courts").

may affirm on any ground supported by the record. Mo. Prot. & Advocacy Servs. v. Mo Dep't of Mental Health, 447 F.3d 1021, 1023 (8th Cir. 2006) (citation omitted).

The question before us is whether under the Lloyd's policy, " [SMG had] an insurable interest in the [cargo] at the time of the loss." Under Arkansas's version of the Uniform Commercial Code, "[t]he seller retains an insurable interest in goods so long as title to or any security interest in the goods remains in him." Ark. Code Ann. § 4-2-501(2). In order to determine whether SMG retained any insurable interest in the cargo, we must determine whether title passed from SMG to KVADRO.

"Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods . . . . [I]f the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment." Id. § 4-2-401(2)(a). Invoices 199 and 206 state the shipment terms are C.I.F., and under Arkansas law, if the seller has performed his obligations under a C.I.F. shipment contract, the risk of subsequent loss or damage passes to the buyer upon shipment. Id. § 4-2-320 cmt. n. 1. "Delivery to the carrier is delivery to the buyer for purposes of risk and 'title.'" Id. In a C.I.F. contract, the seller is required to: (1) "put the goods into the possession of a carrier at the port for shipment and obtain a negotiable bill or bills of lading covering the entire transportation to the named destination"; (2) "load the goods and obtain a receipt from the carrier . . . showing that the freight has been paid or provided for"; (3) "obtain a policy or certificate of insurance, including any war risk insurance"; (4) "prepare an invoice of the goods"; and (5) "forward and tender with commercial promptness all the documents in due form and with any indorsement necessary to perfect the buyer's

rights." Id. § 4-2-320(2)(a)-(e). It is undisputed SMG complied with all its obligations under the contracts with KVADRO.[5]

On appeal, SMG first asserts the term C.I.F. was a typographical or clerical error and postulates the parties did not intend for cargo to be shipped C.I.F. In response, Lloyd's argues (1) the clerical error argument is being raised for the first time on appeal, and (2) invoices 199 and 206 are unambiguous, clearly indicating the cargo was shipped C.I.F. The issue of clerical error is raised for the first time on appeal; therefore, we do not consider it. See Wever v. Lincoln County, Neb., 388 F.3d 601, 608 (8th Cir. 2004) ("Ordinarily, this court will not consider arguments raised for the first time on appeal." (citation omitted)). Without an evidentiary record developed in the district court to prove or disprove a typographical or clerical error, consideration of this argument on appeal is particularly inappropriate. See Orr v. Wal-Mart Stores, Inc., 297 F.3d 720, 725 (8th Cir. 2002) ("We consider a newly raised argument only if it is purely legal and requires no additional factual development, or if a manifest injustice would otherwise result." (citation omitted)).

For its remaining arguments, SMG points to prior conduct of the parties to show the parties did not intend invoices 199 and 206 to be C.I.F. shipments. Arkansas's parol evidence rule bars the introduction into evidence of any prior agreement of the parties that contradicts the terms of an unambiguous contract. See Ark. Code Ann. § 4-2-202. However, the Arkansas Supreme Court has declared that evidence of "a course of dealing that explains or supplements a contract is competent evidence of the parties' intent and can become a part of a contract." Bank of Am. v. C.D. Smith Motor Co., 106 S.W.3d 425, 429-30 (Ark. 2003) (citation omitted).

---

[5]In the district court, Lloyd's filed a statement of undisputed facts, SMG responded, contesting certain facts, and the district court found, based on these filings, "[SMA] complied with all its obligations under the terms of the contract between Sams and KVADRO."

As proof the parties did not intend the shipment terms on invoices 199 and 206 to be C.I.F., SMG first asks the court to consider prior SMG-KVADRO shipment invoices, which show the shipping terms as "F.A.S." (free alongside).[6] This evidence is offered to contradict the terms of invoices 199 and 206, and therefore is barred by the parol evidence rule. Furthermore, even if the evidence fell within Arkansas's course of dealing exception to the parol evidence rule, it is contradicted by the testimonies of Andrew Sams (Sams), SMG's president, and Brant Turner (Turner), SMG's accountant. Sams admitted invoices 199 and 206 "definitely show[] C.I.F." and "[w]e stated C.I.F. because that's what we–that's what we charged [Budilin]. He was in charge of the port handling fees, the customs clearance, [and] the discharging from the vessel." Sams further admitted SMG and KVADRO could have different terms for different shipments.

Turner also confirmed that the shipment terms on invoices 199 and 206 were C.I.F. and that SMG "shipped [the cargo] just like we should have." Also, in an e-mail to an insurance broker attempting to recover the cargo, Turner detailed the shipment terms of invoices 199 and 206, indicating (1) "The terms of the sale were C.I.F. . . . This is documented on the invoice, no other contract exist [sic] that I am aware of"; (2) "The title was to pass with the original [bills of lading] as long as the customer was in terms"; (3) "Again the contract is the invoice"; (4) "The customer was responsible for customs in all instances. We have a copy of the customs payment"; and (5) "All along our invoiced customer, Budilin, has said that he is working to get the cargo and understands his responsibilities." Thus, SMG clearly intended C.I.F. shipment contracts.

SMG next asks the court to infer from the payment schedule that the parties did not intend C.I.F. contracts. We decline to do so. SMG argues the credit extended,

---

[6]F.A.S. is a delivery term under which the seller, at his own expense and risk, must deliver the goods in the manner designated and provided by the buyer, and obtain and tender a receipt for the goods. Ark. Code Ann. § 4-2-319(2)(a)-(b).

with no final payment until after delivery, constituted an insurable interest. By extending credit to KVADRO and requiring only a down payment before placing the cargo with the carrier in New Orleans, SMG did not change the terms of the shipment contracts or prevent title from passing. Furthermore, Turner testified SMG extended credit to KVADRO to "get as much poultry on the water on or before March 10th as possible because we knew that these changes [to veterinary certificates by the Russian government] would be coming into place." These credit terms do not change or modify the C.I.F. contract terms or the clear testimony of SMG's officers confirming the C.I.F. shipments. SMG does not argue, nor does the record show, SMG retained any security interest in the goods after title passed when the cargo was delivered to the carrier. Therefore, under Arkansas law, SMG did not retain an insurable interest in the cargo. See Ark. Code Ann. § 4-2-501(2).

We need not consider SMG's remaining contentions regarding the intentions of the parties as they amount to mere speculation, and therefore are not enough to survive a motion for summary judgment. See Bloom, 440 F.3d at 1028. Furthermore, because we conclude SMG had no insurable interest under the terms of the Lloyd's policy, we need not reach Lloyd's alternative theories for summary judgment.

## III.   CONCLUSION

We affirm the district court's grant of summary judgment.

BEAM, Circuit Judge, dissenting.

Lloyd's of London (Lloyd's) issued an insurance policy to Sams Management Group (SMG), delivered certificates of insurance under the marine risk portions of the policy purporting to cover two shipments of frozen chicken purchased by KVADRO for delivery in Russia, collected a premium from SMG for these insurance services but now contends that its policy was actually illusory, insuring no risks for any party

involved in the transactions at issue in this case. Lloyd's contentions are both unconscionable and contrary to the law and facts. Accordingly, I respectfully dissent.

The district court, accepting Lloyd's gloss on the facts, Lloyd's interpretation of the involved documents and Lloyd's construction of the Arkansas Uniform Commercial Code (UCC), held that title to the chicken passed to KVADRO upon delivery of the products to the ship for transportation, leaving SMG without an insurable interest.[7] This conclusion is clearly wrong.

It is undisputed that the invoices prepared by SMG selling the chicken to KVADRO indicated that this was to be a C.I.F. transaction. A C.I.F. sale means that the price includes the cost of the goods, insurance, and freight. Ark. Code Ann. § 4-2-320(1). The seller must put the goods in possession of the carrier and obtain bills of lading; load the goods and obtain a receipt indicating that the freight is paid; obtain a policy or certificate of insurance; prepare an invoice; and forward all documents to the buyer. Id. § 4-2-320(2). An insurance policy or certificate should list either the buyer, in this case KVADRO, or "for the account of whom it may concern," again, in this case, KVADRO. Id. § 4-2-320, cmt. n.9.[8] A C.I.F. sale is "not a destination but a shipment contract with risk of subsequent loss or damage to the goods passing to the

_____

[7]Arkansas defines an insurable interest as, "any actual, lawful, and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction, or pecuniary damage or impairment." Ark. Code Ann. § 23-79-104. An insurable interest extends beyond a property interest: "in order to have an insurable interest, a party does not have to have legal title to the property insured, but some legal basis for the assertion of interest. This legal interest can be based upon '(a) factual expectation of damages, (b) property interests, (c) legal liability, (d) and contract right.'" Beatty v. USAA Cas. Ins., 954 S.W.2d 250, 254 (Ark. 1997), quoting Warren Freedman, Richards on the Law of Insurance § 2:5.

[8]A C.I.F. contract "contemplates that before the goods arrive at their destination they may be sold again and again on C.I.F. terms." Ark. Code Ann. § 4-2-320, cmt. n.8. The original insurance policy remains with the goods. Id.

-10-

buyer upon shipment *if the seller has properly performed all his obligations*." Id. §
4-2-320, cmt. n.1 (emphasis added).  In this case, SMG had an insurable interest at all
times because the seller (SMG) failed to procure insurance from Lloyd's on behalf of
the buyer (KVADRO)[9] and because the payment terms were contrary to a C.I.F.
contract.

I first consider the insurance requirement.  The terms of the Lloyd's policy are
found in Exhibit I.  Appellant's Abstract at 240-295.  The insured is defined as "Sams
Management Group, Inc &/or Morningstar Provisions LLC and/or as Agents and/or
Subsidiary and/or Associated and/or for whom they may have instructions to insure."
Id. at 242.  It is certainly arguable that a generic reference to"for whom they may have
instructions to insure" could have made KVADRO an insured.  There is absolutely no
evidence, however, that Lloyd's was instructed to or did insure anyone but SMG.[10]

---

[9]The court notes that the district court found that "[i]t is undisputed SMG
complied with all its obligations under the contracts with KVADRO." Ante at 7.  This
was a fact advanced by Lloyd's in the context of a C.I.F. contract.  While SMG did not
dispute that it had complied with its obligations under the contract, it contended that
the contract was actually an F.A.S. contract, which imposes different contractual
obligations than a C.I.F. contract, particularly with respect to insurance.  The district
court's further finding that SMG complied with all C.I.F. obligations seems solely
based on Lloyd's presentation of facts disputed by SMG and was made without the
existence of any insurance policies or certificates naming KVADRO as insured.  This
factual determination by the district court was not made under evidence most
favorable to the non-moving party and was an improper exercise of the district court's
authority under a motion for summary judgment.

[10]Further, the Lloyd's policy contained a third-party exclusion clause that
Lloyd's successfully used to deny benefits to the freight carrier, P & O, and almost
certainly would have been used by Lloyd's to disclaim any benefits to KVADRO.
Appellant's Abstract at 245.  This exclusion clause also appears on each of the
insurance certificates.  Id. at 296-99.

The Lloyd's policy requires the issuance of an insurance certificate for each transaction. Id. at 254-56. This was done. The certificates issued in conjunction with this particular sale were, however, "effected for account of Sams Management Group, Inc. or Order." Id. at 296-99. KVADRO is not mentioned. The UCC does, as earlier noted, contemplate insurance effected "for the account of whom it may concern" but, again, no such designation is contained in either certificate. Without a specific reference to KVADRO or the more general reference to "of whom it may concern," the insurance that SMG bought from Lloyd's was not for the benefit of the buyer, as required under a C.I.F. contract.[11] Ark. Code Ann. § 4-2-320, cmt. n.9. Thus, SMG at all times relevant retained an insurable interest in the chicken, as an insurer.

Under a C.I.F. contract, SMG had an obligation to "obtain a policy or certificate of insurance." Id. § 4-2-320(2)(c). By failing to have the buyer named, either specifically or generically, on the certificates of insurance, under Lloyd's insurance policy which specifically precluded third-party benefits, SMG became the insurer of the shipment, either intentionally or unintentionally. Kumar Corp. v. Nopal Lines, Ltd., 462 So.2d 1178, 1184 (Fla. Dist. Ct. App. 1985). As the insurer of the shipment, SMG was obliged to pay KVADRO, the buyer of the goods, for any loss it might sustain. Under this scenario and assuming this to be a C.I.F. contract, SMG clearly retained an insurable interest in the shipment of chicken which interest it indemnified under the terms and conditions of the policy and certificates of insurance it purchased and received from Lloyd's.

Second, the payment terms in the contract dictate that this transaction was not a C.I.F. sale. The court correctly notes that "a course of dealing that explains or

---

[11]This deficiency may have been the stuff of a claim by KVADRO against SMG, had KVADRO actually retained a financial interest in the shipment, which it did not do as established by the record. Appellant's Abstract at 65. But, in any event, SMG's purported breach of its obligation to KVADRO provides no basis for Lloyd's to disclaim coverage under its policy or certificates.

supplements a contract is competent evidence of the parties' intent and can become a part of a contract." Bank of Am. v. C.D. Smith Motor Co., 106 S.W.3d 425, 429-30 (Ark. 2003). The "terms or conditions agreed to by the parties must control over the general reference to C.I.F. contained on the face of [a] document." Steuber Co. v. Hercules, Inc., 646 F.2d 1093, 1097 (5th Cir. 1981). "'[I]f according to the intention of the parties the actual delivery of the goods [to the buyer] is an essential condition of performance, the contract is not a c.i.f. contract.'" Kumar Corp., 462 So.2d at 1184 (quoting C. Schmitthoff, Schmitthoff's Export Trade, The Law and Practice of International Trade, 39 (7th ed. 1980)) (alteration in original). While the commentary to the UCC explains that under a C.I.F. contract, title and risk of loss pass to the buyer upon shipment, Ark. Code Ann. § 4-2-320 cmt. n.1, there is no mention of the risk of loss in the text of the UCC. See id. § 4-2-320. "The commentary to a statute is not controlling over the statute's clear language, but is a highly persuasive aid to construing that statute." Huffman v. Ark. Judicial Discipline and Disability Comm'n, 42 S.W.3d 386, 392 (Ark. 2001).

Here, final payment by KVADRO was not to be made against the documents as required under a C.I.F. contract, Arkansas Code Annotated § 4-2-320(4), but was rather to be made upon delivery of the goods to KVADRO or its designated consignee in St. Petersburg, Russia.[12] The sales contracts required sixty percent payment "due 19 days after discharge" of the chicken from the ship in St. Petersburg, Appellant's Abstract at 32-33, obviously a payment to be made subsequent to the completion of "freight to the named destination." Ark. Code Ann. § 4-2-320(1). As can be seen,

_____

[12]Though the UCC allows the existence of a C.I.F. contract with payment due after the arrival of the goods, Ark. Code Ann. § 4-2-321(3), this C.I.F. variant nonetheless does not contemplate arrival of the goods as a condition precedent to payment. Id. at cmt. In contrast, the SMG-KVADRO contract conditioned payment on the arrival of the goods in St. Petersburg, evidenced by the nonpayment of the final sixty percent installment, as well as the transfer of KVADRO's previous payments to subsequent shipments. Appellant's Abstract at 65.

these terms patently flout the C.I.F. requirements of the UCC.  Id.  Likewise, the deposition testimony and the actions of SMG and KVADRO run in direct opposition to the UCC commentary, which would pass the risk of loss to the buyer upon shipment.  Id. § 4-2-320 cmt. n.1.  Brant Turner of SMG testified that C.I.F. meant "[c]ost, insurance, and freight," explaining "I had the freight insurance."  Appellant's Abstract at 39-40.  He also explained that the arrangement with SMG's supplier allowed for SMG to make payments as sales commenced after the product was at its destination.[13]  Id.  Andrew Sams of SMG explained the difference between F.A.S. and C.I.F. contracts as billing terms, id. at 315, dependent on whether "our container rate for shipping included the discharge into the container yard."  Id. at 313.  Further, SMG behaved as though it retained both title and risk of loss:  SMG retained the third original of the Bills of Lading, Appellant's Abstract at 40, dealt directly with the shipper to change the consignee on the Bills of Lading, id. at 43, accepted the loss of the chicken by crediting KVADRO's payment to other shipments, id. at 65, and never demanded payment of the final sixty percent KVADRO "didn't have an obligation" to pay, having never received the product.  Id. at 314.  Indeed, the Arkansas State Supreme Court has said that it will adopt the commentary to the Criminal Code unless "clearly convinced that it is erroneous or that it is contrary to the settled policy of this state."  State v. Reeves, 574 S.W.2d 647, 648-49 (Ark. 1978).  Faced with a situation where the commentary is directly contrary to the intent and actions of the parties, the court should not insert the UCC commentary into the SMG-KVADRO contract.  Therefore this was not a "true" C.I.F. sale with all the trappings added by the UCC and

------

[13]The fact that SMG owed its supplier for the chicken is likely sufficient to vest SMG with an insurable interest.  See Hartford Ins. Co. v. Stanley, 644 S.W.2d 628, 629 (Ark. Ct. App. 1983) (In examining a situation where a cotton picker had been sold and delivered to the buyer, because the seller still owed money to his financier, the court concluded that "as long as [the seller] was legally liable for the purchase price of the cotton picker he had an insurable interest in it.  We do not agree that passage of title to the machine destroyed that insurable interest.").

-14-

its commentary, title did not pass upon shipment, and SMG retained an insurable interest in the chicken.

For the reasons stated, SMG at every step had an insurable interest in the frozen chicken covered by the Lloyd's policy and certificates of insurance. Thus, I would reverse the district court and remand for further proceedings.

_____