**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 13-1089

KIMBERLEE WILLIAMS, individually, as personal
representative of the Estate of Charles L. Williams, deceased
on behalf of said estate, and as representative of others
similarly situated; NANCY PEASE, individually, as personal
representative of the Estate of William Clark, deceased on
behalf of said estate, and as representative of others similarly
situated; MARILYN HOLLEY, as personal representative of
the Estate of Kathryn Darnell, deceased on behalf of said
estate, and as representative of others similarly situated; and;
DONNA WARE, individually, as personal representative of
the Estate of Jennifer Graham, deceased on behalf of said
estate, and as representative of others similarly situated;
DONNETTE WENGERD, individually, as personal
representative of the Estate of Jennifer Graham, deceased on
behalf of said estate, and as representative of others similarly
situated; ROSANNE CHERNICK,
                                                    Appellants

v.

BASF CATALYSTS LLC; CAHILL GORDON AND
REINDEL LLP; CAHILL GORDON AND REINDEL, A
Partnership including a Professional Corporation; THOMAS
D. HALKET; ARTHUR A. DORNBUSCH, II; GLENN
HEMSTOCK; HOWARD G. SLOANE, a/k/a Peter Sloane;

IRA J. DEMBROW; SCOTT A. MARTIN; JOHN DOE BUSINESS ENTITIES 1 TO 100, are fictitious coporations, partnerships, or other business entities or organizations that BASF Catalysts LLC is responsible or liable for and whose identities are not presently known, which entities may have mined, milled, manufactured, sold, supplied; JOHN DOE BUSINESS ENTITIES 101 TO 200, are the fictitious firms, corporations, partnerships, limited liability companies/associations or other business entities or organizations whose indentities are not presently known, and who may have perpetrated, or are responsible for, are the alter egos; JOHN DOE LAWYERS 1 TO 500, are the fictitious names of lawyers and law firms, legal professional corporations, legal professional partnerships, or other professional business business entities or organizations, or their agents, employees, or servants, acting within the course and; JOHN DOE 1 TO 500, are the fictitious names of individuals whose identities are not presently known, who may have perpetrated, aided and abetted, conspired with, acted in concert with and/or are secondarily responsible or liable under law for the conduct or activities of

_____

On Appeal from the United States District Court
for the District of New Jersey

(D.N.J. No. 2-11-cv-01754)

District Judge: Honorable Stanley R. Chesler

_____

Argued: March 13, 2014

Before: McKEE, *Chief Judge*, and AMBRO and FUENTES,
*Circuit Judges*

(Filed: September 3, 2014)

Michael Coren, Esq,
Harry M. Roth, Esq.
Cohen, Placitella & Roth, P.C.
2001 Market Street
Two Commerce Square, Suite 2900
Philadelphia, PA 19103

Christopher M. Placitella, Esq.
Cohen, Placitella & Roth, P.C.
127 Maple Avenue
Red Bank, N.J. 07701

Jeffrey M. Pollock, Esq. [Argued]
Fox Rothschild LLP
Princeton Pike Corp. Center
997 Lennox Drive
Princeton Pike Corporate Center, Building 3
Lawrenceville, N.J. 08648
        *Attorneys for Appellants*

Stephen M. Orlofsky
David C. Kistler
Blank Rome LLP
301 Carnegie Center, 3rd Floor
Princeton, N.J. 08540

Eugene F. Assaf, Esq. [Argued]
Daniel A. Bress, Esq.
Peter A. Farrell, Esq.
Michael F. Williams, Esq.
Kirkland & Ellis LLP

655 Fifteenth Street, N.W.
Suite 1200
Washington, D.C. 20005
    *Attorneys for Appellee BASF Catalysts LLC*

Robert E. Ryan, Esq.
Marc D. Haefner, Esq,
Craig S. Demareski, Esq.
Connell Foley LLP
85 Livingston Avenue
Roseland, N.J. 07068

John K. Villa, Esq.
David S. Blatt, Esq.
Kannon K. Shanmugam, Esq, [Argued]
Matthew B. Nicholson, Esq.
Richard A. Olderman, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
    *Attorneys for Appellees Cahill Gordon & Reindel LLP,*
    *Howard G. Sloane, Ira J. Dembrow, and Scott A.*
    *Martin*

Eric Tunis, Esq. [Argued]
Greenbaum, Rowe, Smith & Davis
99 Wood Avenue South
Iselin, NJ 08830

Olivier Salvagno Esq.
Greenbaum, Rowe, Smith & Davis LLP
Metro Corporate Campus One, Suite 4
P.O. Box 5600

Woodbridge, N.J. 07095
*Attorneys for Appellee Thomas D. Halket*

Walter F. Timpone, Esq.
Walter R. Krzastek, Jr., Esq.
Michael B. Devins, Esq.
McElroy, Deutsch, Mulvaney & Carpenter, LLP
1300 Mt. Kemble Avenue
P.O. Box 2075
Morristown, N.J. 07962
*Attorney for Appellee Glen Hemstock*

Kevin H. Marino, Esq.
John A. Boyle, Esq.
Marino, Tortorella & Boyle, P.C.
437 Southern Boulevard
Chatham, N.J. 07928
*Attorneys for Appellee Arthur A. Dornbusch, II*

---

OPINION

---

FUENTES, <u>Circuit Judge</u>.

This putative class action lawsuit alleges that BASF Catalysts LLC and Cahill Gordon & Reindel conspired to prevent thousands of asbestos-injury victims from obtaining fair tort recoveries for their injuries. Decades ago, BASF's predecessor, Engelhard Corp, discovered that its talc products contained disease-causing asbestos. Plaintiffs allege that, rather than confront the consequences of this discovery,

Engelhard, with the help of its attorneys from Cahill, elected to pursue a strategy of denial and deceit. According to the complaint, Engelhard and Cahill collected the tests and reports that documented the presence of asbestos in Engelhard talc and they destroyed or hid them; when new plaintiffs focused on Engelhard's talc as a possible cause of their disease, Engelhard represented that its talc did not contain asbestos and that no tests had ever said otherwise.

As pleaded, this lawsuit concerns years of purported deceit by Engelhard and Cahill. This action is not itself an asbestos injury case, but rather an action about Engelhard and Cahill's conduct when they confronted asbestos injury cases in state courts around the country. The alleged scheme outlived most of the original plaintiffs, whose diseases have since taken their lives. It did not last forever. Spurred by recent testimony that Engelhard's talc contained asbestos and that the company knew it, survivors and successors of the original asbestos-injury suits have brought new claims against Cahill and BASF, Engelhard's successor. The crux of their complaint is that BASF and Cahill defrauded them in their initial lawsuits and caused them to settle or dismiss claims that they would otherwise have pursued.

The District Court dismissed plaintiffs' complaint in its entirety. Analyzing the claims individually, the District Court determined that each was inadequately pled or barred by law. Analyzing the various declarations and injunctions requested by plaintiffs—ranging from an injunction against the future invocation of res judicata based on past state court judgments to a declaration that BASF and Cahill committed fraud—the District Court dismissed them as beyond its power to grant. The Court did, however, reject defendants' argument that the *Rooker-Feldman* doctrine deprived it of jurisdiction. Plaintiffs

have appealed the dismissal of three claims: fraud, fraudulent concealment, and violation of the New Jersey Racketeer Influenced and Corrupt Organizations Act. Plaintiffs also defend their requested relief.

We conclude that the District Court erred when it dismissed the fraud and fraudulent concealment claims. The Amended Class Action Complaint properly alleges the elements of fraud and fraudulent concealment—namely that BASF and Cahill lied about and destroyed the asbestos evidence to plaintiffs' detriment. Neither the New Jersey litigation privilege nor pleading requirements stand in the way of these claims.

The District Court did not err in dismissing the New Jersey RICO claim. Plaintiffs, obliged to plead an injury to their business or property, have not done so. They have alleged an injury to the prosecution of their earlier lawsuits which, under New Jersey law, does not constitute an injury to their property.

Lastly, the District Court correctly discerned that it could not grant plaintiffs all of their requested relief. To the extent that plaintiffs attempt to have the District Court decide, at this point, the statute of limitations, laches, and preclusion issues that will likely arise in future cases, plaintiffs fail to present at Court with a whole or ripe controversy. Plaintiffs may, however, seek injunctive and declaratory relief aimed at resolving the claims alleged.

Accordingly, we reverse in part, affirm in part, and remand for further proceedings.

## I. Background of the Case

We accept as true the Amended Class Action Complaint's well-pled allegations. That complaint alleges a sustained plot by BASF and its law firm, Cahill Gordon, to mislead actual and

7

potential asbestos-exposure plaintiffs into believing that BASF's talc products did not contain asbestos. In truth, plaintiffs contend, BASF's own tests and records proved that its talc products contained asbestos.

Defendants in this case include both Engelhard's successor, BASF, and Engelhard's former employees and attorneys. For much of the events of the case, the relevant BASF companies operated under the Engelhard label.[1] Thomas D. Halket was BASF's in-house counsel assigned to asbestos claims. Glenn Hemstock was BASF's Vice President of Research and Development. Hemstock supervised those scientists who "tested or conducted research on Engelhard's talc." Compl. ¶ 42. Arthur A. Dornbusch II was BASF's General Counsel. We refer to these BASF defendants as "BASF" or "Engelhard."

Cahill Gordon & Reindel LLP represented BASF and its predecessors in asbestos litigation from 1983 to 2010. During that time, Howard G. Sloane, Scott A. Martin, and Ira J. Dembrow worked for BASF as lawyers at Cahill. We refer to these Cahill defendants as "Cahill."

The six named plaintiffs in this action represent the interest of a deceased spouse or relative who had worked in proximity to asbestos and died of asbestos disease. These plaintiffs—for whom we will often use Kimberlee Williams as a representative—assert fraud, fraudulent concealment, and New Jersey RICO claims on behalf of their deceased relatives.

---

[1] The Engelhard businesses included Engelhard Corp., Engelhard Industries, Engelhard Mineral & Chemical Corp., and Eastern Magnesia Talc Co. BASF acquired the Engelhard companies in 2006.

8

**A.** *Engelhard mined talc containing asbestos.*

From 1967 to 1983, Engelhard operated a talc mine in Johnson, Vermont. "Talc is a naturally occurring mineral that is mined and then processed or used in manufacturing by companies in numerous parts of the United States." Compl. ¶ 68. Engelhard processed the talc from the Johnson Mine into products, such as "Emtal talc" and "G&S Talc." Compl. ¶ 73. These products found use in wall board, joint compound, auto body "filler," dusting agents, and children's balloons. Compl. ¶ 74.

Emtal talc and other Engelhard talc products "contained chrysotile asbestos fibers, as well as other asbestos forms including tremolite and serpentine asbestos." Compl. ¶ 75. During the 1970s and 1980s, multiple laboratory tests indicated that Engelhard talc, including Emtal brand talc and talc from the Johnson Mine, contained asbestos. Engelhard, and later BASF, "had knowledge" of these tests and their results, and, in fact, maintained "[t]he tests and assay results" in their records. Compl. ¶¶ 76-80.

Faced with unfavorable test results, Engelhard ignored them. According to the complaint, Engelhard "represented to its customers, industry trade groups and the Federal Government that the Emtal talc was asbestos free and even marketed the product as a viable asbestos substitute, thereby causing wide spread [sic] and unknowing exposure to asbestos to United States citizens, including workers and workers' spouses and children, nationwide." Compl. ¶ 83.

**B.** *Engelhard gets sued for the asbestos-related death of an employee.*

In 1979, David Westfall sued Eastern Magnesia Talc Company, an Engelhard subsidiary, for exposing his deceased

9

relative to asbestos. Cahill Gordon defended Eastern Magnesia in the suit. The lawsuit turned-up "test and assay results" confirming the presence of asbestos in Engelhard's talc. Compl. ¶ 91.

Engelhard's personnel and records demonstrated that the talc had been contaminated. Glenn Hemstock, then an Engelhard scientist and executive, gave two days of deposition testimony in the *Westfall* case. Hemstock testified that Emtal talc contained asbestos fibers. He "admitted that various tests performed throughout the 1970s and 1980s, both by [Engelhard] employees and by third parties, indicated the presence of asbestos fibers in Emtal talc that was tested or assayed." Compl. ¶ 98. Emil J. Triglia, an Engelhard employee, also testified that Emtal talc contained asbestos fibers. Peter Gale, an Engelhard researcher, testified that he had conducted analytical testing on talc ore samples obtained from the Johnson mine. He recorded his results in lab notebooks stored in Engelhard's library.

After these depositions, BASF, through Cahill, settled the *Westfall* case. The settlement included a confidentiality clause that prohibited the *Westfall* parties from discussing the case or sharing the evidence. Much of the *Westfall* evidence has yet to be seen again.

### C. *Engelhard covers-up its asbestos exposure to mitigate future tort liabilities.*

Engelhard anticipated that the *Westfall* action would be the first of many asbestos lawsuits. In March 1984, Hemstock circulated a memorandum entitled "DOCUMENT RETRIEVAL—DISCONTINUED OPERATIONS." Compl. ¶ 128. The memorandum directed Engelhard employees to collect for discard documents relating to Emtal talc. It stated

10

that "[i]t is the policy of Engelhard Corporation to avoid the undue accumulation of documents that are no longer likely to be needed in our business operations." Compl. Ex. 3. The memorandum instructed employees to collect materials related to Engelhard Minerals Ltd. and Emtal, among other "discontinued operations." Compl. Ex. 3. The employees complied. "All documentary evidence relating to Engelhard's asbestos-containing talc[] was thereafter gathered up, collected by the BASF Perpetrators or their agents, and subsequently was either destroyed or secreted away . . . ." Compl. ¶ 131.

Next, the complaint alleges, Engelhard manufactured favorable evidence with Cahill's help. Together, they assembled "template and stock pleading, discovery and motions documents for use by local counsel in asbestos injury claim lawsuits" that contained false or misleading information about Emtal talc products. Compl. ¶ 144(e). Engelhard and Cahill procured "false unsworn and sworn representations, including false affidavits, false and incorrect expert reports and discovery response verifications by [Engelhard] employees, [Engelhard] officers, and/or [Engelhard] consultants and experts." Compl. ¶ 144(h).

Cahill and Engelhard, and later, BASF, used the absence of inculpating evidence and the existence of false exonerating evidence to frustrate asbestos injury suits. The complaint charges that, when lawsuits materialized, BASF and Cahill misled the claimants about the facts. "[W]henever an asbestos injury claim or lawsuit was filed or came to BASF's attention," BASF represented "systematically and  uniformly
. . . that Emtal talc ore and products did not contain asbestos and/or there was not any evidence that it did." Compl. ¶ 138. Indeed, BASF's lawyers threatened claimants and their lawyers "with the possibility of sanctions or penalties if

11

asbestos claims or suits were not discontinued by questioning counsels' good faith basis to continue the claims" in light of BASF's representations that its talc products did not contain asbestos. Compl. ¶ 144(i). Further, because BASF and its lawyers made these misstatements "in correspondence, responses to discovery and/or pleadings or motion papers," they misled courts as well as adversaries. *See* Compl. ¶¶ 144(f), 144(j).

The scheme worked against the named plaintiffs. Williams's husband, Charles, for example, developed asbestosis and lung cancer after a career at Goodyear Tire & Rubber. The Williams sued Engelhard in Ohio state court. Defendants told them that Engelhard's talc did not contain asbestos. In response, they voluntarily dismissed the claims against Engelhard. Similarly, the other plaintiffs discontinued, dismissed, or settled their asbestos-injury lawsuits against BASF based on Engelhard and Cahill Gordon's false representations.

### D. *A recent lawsuit revealed the long-standing scheme.*

The scheme collapsed a few years ago, during a New Jersey Superior Court action. In that case, *Paduano v. Ace Scientific Supply Co.*, a former research chemist for Engelhard testified that he had discovered asbestos in Engelhard's talc while working for the company many years ago. No. MID-L-2976-09 (N.J. Super.). He further testified that Engelhard closed the Johnson mine because it contained asbestos and that defendant Hemstock instructed him to turn over all of his talc-related records.

The chemist's testimony triggered discovery into what documents BASF had destroyed or concealed in the litigation. Many of these documents had been secretly kept in a Cahill

12

storage facility. The *Paduano* case settled and the incriminating documents were placed in escrow pursuant to the terms of the settlement agreement. Among the documents are tests from 1972, 1977, 1978, and 1979 that establish the presence of asbestos fibers in Engelhard talc. None had ever been produced or disclosed in earlier litigation.

### E.  *Proceedings before the District Court*

In the aftermath of the *Paduano* case, Williams and the other named plaintiffs commenced this action. The Amended Class Action Complaint asserted claims of N.J. RICO, N.Y. Judiciary Law § 487, fraudulent concealment, fraud, fraud-upon-the-court, unjust enrichment, and civil conspiracy. For these claims, Williams requests declaratory and injunctive relief intended to constrain BASF and Cahill from asserting res judicata, statute of limitations, or other defenses that may be asserted in future or re-activated asbestos-injury suits. Williams also requests a range of other relief, including class certification, a notice "informing Class Members or their representatives of the pendency of this action," an injunction against further spoliation or misrepresentations, and "[a] determination of Defendants' liability for punitive damages to Plaintiffs and the Class relating to the spoliation of evidence relevant and material to establishing asbestos injury claims against BASF." *See* Complaint Demand for Relief ¶¶ (d), (f), & (i).

BASF, Cahill, and the individual defendants moved to dismiss the Amended Class Action Complaint. They argued that (1) the District Court lacked jurisdiction over the case because of the *Rooker-Feldman* doctrine, (2) the plaintiffs had not adequately pled their claims, and (3) the District Court lacked the authority, or jurisdiction, to order the requested relief due to either the Anti-Injunction Act or principles of

13

justiciability. The District Court rejected the challenge to its jurisdiction, but it accepted most of the other arguments. With respect to the N.J. RICO and fraudulent concealment claims, the Court concluded that Williams had not adequately pled them. With respect to the fraud claim, the Court determined that New Jersey's litigation privilege immunized defendants from tort liability. With respect to the requested relief, the Court determined that it lacked the power to order much of the requested relief because the relief would undermine state court judgments in violation of the Anti-Injunction Act or because the relief would decide issues to be raised in future lawsuits.

Accordingly, the District Court granted BASF's and Cahill's motions under Rule 12(b)(6) of the Federal Rules of Civil Procedure, and dismissed the complaint in its entirety with prejudice. Williams has appealed the dismissals of the N.J. RICO, fraud, and fraudulent concealment claims, and challenged the District Court's conclusions regarding its power to order her requested relief.

## II. Jurisdiction

Defendants renew their *Rooker-Feldman* challenge to federal jurisdiction. The *Rooker-Feldman* doctrine strips federal courts of jurisdiction over controversies "that are essentially appeals from state-court judgments." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 165 (3d Cir. 2010). The District Court concluded that Williams was not appealing from a state court judgment and, therefore, exercised jurisdiction pursuant to 28 U.S.C. § 1332.

We agree with the District Court that Williams's suit does not trigger *Rooker-Feldman* and thereby deprive federal courts of jurisdiction. "*Rooker-Feldman* . . . is a narrow doctrine, confined to cases brought by state-court losers complaining of

injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Lance v. Dennis*, 546 U.S. 459, 464 (2006) (quotation marks omitted); *see Great W. Mining & Mineral Co*, 615 F.3d at 166. Those circumstances do not appear here.

Williams does not complain of an injury caused by a state-court judgment. She asserts claims for fraud, fraudulent concealment, and N.J. RICO. Each of those claims hinges on BASF and Cahill's actions before and during earlier asbestos-injury lawsuits. In particular, Williams targets misrepresentations made by BASF and Cahill regarding the asbestos content of Emtal talc products as well as BASF and Cahill's destruction of material evidence. According to Williams, it was BASF and Cahill's misconduct that injured her, not any state-court judgment. Because this suit does not concern state-court judgments, but rather independent torts committed to obtain them, the *Rooker-Feldman* doctrine does not apply.

We conclude the District Court validly exercised jurisdiction. We exercise jurisdiction pursuant to 28 U.S.C. § 1291.

## III.   Claims

This Court reviews Rule 12(b)(6) dismissals de novo. *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

15

We will consider the fraud, fraudulent concealment, and N.J. RICO claims in turn. Before doing so, however, we must decide which state's law to apply to the tort claims.

## A. *Choice-of-Law*

The parties here brief and rely on New Jersey's common law. But not all of the parties are from New Jersey, nor did all of the events take place there. We, therefore, begin by considering whether to apply the law of New Jersey, as briefed and argued by the parties, or whether to undertake a choice-of-law analysis.

All U.S. Courts of Appeals to have addressed the issue have held that choice-of-law issues may be waived.[2] Our Court has been inconsistent on this point. Decades ago, we refused to

---

[2] *E.g.*, *P.R. Hosp. Supply, Inc. v. Bos. Scientific Corp.*, 426 F.3d 503, 505-06 (1st Cir. 2005); *Saks v. Franklin Covey Co.*, 316 F.3d 337, 349 (2d Cir. 2003); *Bilancia v. Gen. Motors Corp.*, 538 F.2d 621, 623 (4th Cir. 1976); *Fruge v. Amerisure Mut. Ins. Co.*, 663 F.3d 743, 747 (5th Cir. 2011); *Meridia Prods. Liab. Litig. v. Abbott Labs.*, 447 F.3d 861, 865 (6th Cir. 2006); *Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751 (7th Cir. 2012); *P & O Nedlloyd, Ltd. v. Sanderson Farms, Inc.*, 462 F.3d 1015, 1017 n.3 (8th Cir. 2006); *Johnson v. Armored Transp. of Cal., Inc.*, 813 F.2d 1041, 1044 (9th Cir. 1987); *Mauldin v. Worldcom, Inc.*, 263 F.3d 1205, 1211-12 (10th Cir. 2001); *Pulte Home Corp. v. Osmose Wood Preserving, Inc.*, 60 F.3d 734, 739 n.15 (11th Cir. 1995); *Jannenga v. Nationwide Life Ins. Co.*, 288 F.2d 169, 172 (D.C. Cir. 1961); *Warner v. Ford Motor Co.*, 331 F.3d 851, 856 n.2 (Fed. Cir. 2003).

apply the doctrine of waiver to choice-of-law issues: "The appropriate law must be applied in each case and upon a failure to do so appellate courts should remand the cause to the trial court to afford it [the] opportunity to apply the appropriate law, even if the question was not raised in the court below." *United States v. Certain Parcels of Land*, 144 F.2d 626, 630 (3d Cir. 1944). For some time thereafter, this Court refused to apply waiver to choice-of-law issues. *See, e.g.*, *Parkway Baking Co. v. Freihofer Baking Co.*, 255 F.2d 641, 646 (3d Cir. 1958). Then the Court, in *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, assumed that the parties had waived their choice-of-law arguments without discussing their authority to do so. 619 F.2d 1001, 1005 n.1 (3d Cir. 1980). Thereafter, our Circuit, sitting en banc, observed that "choice of law issues may be waived." *Neely v. Club Med Mgmt. Servs., Inc.*, 63 F.3d 166, 180 (3d Cir. 1995) (en banc). As a result, "it [has been] an open question whether choice-of-law issues are waiveable [sic] in this Circuit." *Pac. Emp'rs Ins. Co. v. Global Reinsurance Corp. of Am.*, 693 F.3d 417, 431 n.7 (3d Cir. 2012); *see also Nuveen Mun. Trust v. WithumSmith Brown, P.C.*, 692 F.3d 283, 301 (3d Cir. 2012); *Huber v. Taylor*, 469 F.3d 67, 83 (3d Cir. 2006) (Fuentes, J., dissenting).

Our review of the law in this area convinces us that parties may waive choice-of-law issues. Permitting waiver accords with the law of every other circuit. It also makes sense. Generally speaking, a party abandons any objection that it does not make. *See Puckett v. United States*, 556 U.S. 129, 134 (2009). Of course, litigants may not waive issues that go to the power of the courts to hear a case. *See, e.g.*, *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). But choice-of-law questions do not go to the court's jurisdiction. *See Neely*, 63 F.3d at 174-78. Moreover, the doctrine of waiver serves a functional purpose. By requiring

litigants to identify and argue legal issues before the district courts, we ensure that we have a record to review on appeal. The same principles favor a rule that requires litigants to raise choice-of-law issues to the District Court.

The parties did not litigate the choice-of-law question before the District Court. Further, neither plaintiffs nor defendants have challenged the District Court's use of New Jersey law to analyze the tort claims. To the contrary—in response to our request for supplemental briefing, plaintiffs asserted that they "brought their case in New Jersey asserting claims including New Jersey state law claims of fraud and fraudulent concealment." Williams Rule 28j Letter dated March 20, 2014 at 1, *Williams v. BASF Catalysts LLC*, No. 13-1089. BASF and Cahill both agreed that New Jersey law applied and, moreover, that choice-of-law issues may be waived. BASF Rule 28j Letter dated March 20, 2014 at 1, 3, 5; Cahill Rule 28j Letter dated March 20, 2014 at 1, 3. Thus, to the extent the parties may have sought the application of other law to the tort claims, they have waived their right to do so. Accordingly, we apply New Jersey law.

### B. *The Complaint alleges a plausible claim for fraud.*

We next address the District Court's dismissal of Williams's fraud claim on the basis of New Jersey's litigation privilege. The privilege often immunizes lawyers and parties from recrimination based on their statements in judicial proceedings, but the privilege has never applied to shield systematic fraud directed at the integrity of the judicial process. Nor should it be. Accordingly, we reverse the District Court's dismissal of this claim.

18

### 1. Standard

New Jersey recognizes a common-law fraud cause of action. A plaintiff seeking to recover for fraud must allege five elements: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 260 (N.J. 2005) (quotation marks omitted).

### 2. Analysis

Williams asserts that BASF and Cahill Gordon falsely represented that "BASF and its predecessor companies' talc ore and talc products did not contain asbestos fibers" and "that there was not any evidence BASF and its predecessor companies['] talc ore and talc products contained asbestos." Compl. ¶ 344. The complaint pleads many of these statements precisely, quoting from various letters and faxes sent by Cahill attorneys on behalf of BASF. It alleges that BASF and Cahill offered these representations to Williams, for example, for the purpose of "obstructing, impeding, impairing, [or] terminating" asbestos-injury litigation. Compl. ¶ 347. And Williams alleges that, after receiving these communications, she and the other plaintiffs each altered their litigation posture—settling, dismissing, or abandoning their claims against BASF.

Taken together, Williams has alleged that BASF and Cahill obtained "an undue advantage by means of some act or omission that is unconscientious or a violation of good faith," the essence of fraud. *See Jewish Ctr. of Sussex County v. Whale*, 432 A.2d 521, 524 (N.J. 1981).

Nonetheless, the District Court dismissed the claim on the ground that New Jersey's litigation privilege foreclosed liability for any statements made in the course of asbestos-injury litigation. New Jersey's so-called litigation privilege functions as a form of civil immunity: it "generally protects an attorney from civil liability arising from words he has uttered in the course of judicial proceedings." *Loigman v. Twp. Committee of Twp. of Middletown*, 889 A.2d 426, 433 (N.J. 2006). The privilege reflects "the need for unfettered expression" in adversarial proceedings. *Hawkins v. Harris*, 661 A.2d 284, 287 (N.J. 1995). Cahill and BASF urge the Court to extend the privilege to the false statements and evidence given to Williams and the other plaintiffs.

We decline. New Jersey's Supreme Court has interpreted the privilege to "protect[] attorneys not only from defamation actions, but also from a host of other tort-related claims." *Loigman*, 889 A.2d at 436. But New Jersey's Supreme Court has never recognized the litigation privilege to immunize systematic fraud, let alone fraud calculated to thwart the judicial process. Thus, we are "charged with predicting how that court would resolve the issue." *See Illinois Nat'l Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 653 F.3d 225, 231 (3d Cir. 2011). We believe that New Jersey's Supreme Court would not extend the privilege to this claim.

First, the complaint describes conduct that impairs New Jersey's goals for the litigation privilege. "One purpose of the privilege is to encourage open channels of communication and the presentation of evidence in judicial proceedings." *Hawkins*, 661 A.2d at 289 (quotation marks omitted). Another is to afford parties "an unqualified opportunity to explore the truth of a matter without fear of recrimination." *Id.* at 289-90. Here, the claim is that lawyers and litigants actively frustrated the

search for the truth and purposefully misled their adversaries. The purposes of the privilege are never served by allowing counsel to practice deceit and deception in the course of litigation, nor by permitting counsel to make false and misleading statements in the course of judicial proceedings.

Indeed, when this kind of misconduct has occurred in the past, policy considerations have weighed against extending the privilege. In *Matsuura v. E.I. du Pont de Nemours & Co.*, for example, the Supreme Court of Hawaii confronted claims that DuPont and its attorneys withheld inculpating chemical evidence from their adversaries and caused them to settle their claims. 73 P.3d 687, 689-92 (Haw. 2003). The Court decided that the law's interest in resolving disputes fairly and on the merits outweighed the competing interest in placing judgments or parties beyond reproach. *See id.* at 700. Although New Jersey's litigation privilege is similarly concerned with "giving finality to judgments, and avoiding unending litigation," *Hawkins*, 661 A.3d at 292, we think New Jersey would follow Hawaii's approach on these facts. The practice of allowing attorneys and litigants to use unfettered expression to make their cases is to serve the courts' truth-seeking function; it is not the goal in itself. Thus, when, as here, defendants have uttered words that prevent a fair proceeding, the litigation privilege provides no relief.

Second, New Jersey's Supreme Court has admonished that "[t]he absolute privilege does not extend to statements made in situations for which there are no safeguards against abuse." *Hawkins*, 661 A.2d at 291 (quoting *Demopolis v. Peoples Nat'l Bank*, 796 P.2d 426, 430 (Wa. Ct. App. 1990) (quotation marks omitted)). For defamation and the like, judicial oversight or criminal or professional sanctions often adequately deter litigation misconduct. *Loigman*, 889 A.2d at 438. These

21

deterrents prove inadequate for systematic fraud. For one thing, the misconduct occurred in and out of courtrooms from Ohio to Pennsylvania to New York. No single court had the perspective or authority to mitigate the fraud or the ability to detect it. For another, Williams has alleged that BASF—the client—was responsible for "verifying the truth of [its] discovery responses" and for "[s]uborning or otherwise procuring false unsworn and sworn representations from its employees, officers[,] consultants and experts." Compl. ¶¶ 143(d), 143 (g). Professional sanctions have little deterrent value against clients. Finally, this alleged fraud apparently outlasted the careers of many of the perpetrators. However appropriate professional discipline may have been (or may still be), should the allegations be proven true, that discipline would be too little and too late to do any good for the plaintiffs or the courts.

Third, the allegations of this case place the offending conduct far from the core of the privilege. Although "[t]he litigation privilege protects attorneys not only from defamation actions, but also from a host of other tort-related claims," the privilege is "[t]ypically" invoked against defamatory remarks. *See Loigman*, 889 A.2d at 435-36. Indeed, the Restatement of Torts identifies this type of privilege as a defense to a defamation action. *See* Restatement (Second) of Torts §§ 586 (defense for attorney at law), 587 (defense for parties to judicial proceedings). This case is not a situation where a witness, lawyer, or agent made hurtful or defamatory remarks about another, as in *Hawkins*. 661 A.2d at 287-290. Rather, the allegations here describe conduct calculated to thwart the judicial process and, in that way, are more akin to malicious prosecution, perjury, and spoliation. The judicial privilege will not excuse malicious prosecution or criminal perjury. *See Dello Russo v. Nagel*, 817 A.2d 426, 433 (N.J. Super. Ct. 2003)

(malicious prosecution); *Durand Equip. Co. v. Superior Carbon Prods., Inc.*, 591 A.2d 987, 989 (N.J. Super. Ct. 1991) (perjury). Nor will it apply to claims of spoliation, which concerns a party's conduct and not the party's statements. *See Viviano v. CBS, Inc.*, 597 A.2d 543, 549-550 (N.J. Super. Ct. 1991). We conclude that it likewise would not apply here.

Fourth, even a broad reading of the privilege fails to fit the facts of this case. "The privilege shields any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." *Loigman*, 889 A.2d at 437 (quotation marks omitted). Here, the complaint alleges, BASF and Cahill engineered the false statements and evidence in advance of litigation. Then, either directly or through local counsel, BASF and Cahill deployed their prefabricated defense against claimants as they arose. They did not merely use a permissible procedural device in bad faith, as in *Loigman.* 889 A.2d at 437. They rigged the game from the beginning. Thus, we cannot accept, as BASF contends, that its statements were made "to achieve the object of the defense" insofar as they "were made with the aim of defeating Plaintiffs' asbestos personal injury claims and shielding BASF from liability." BASF Br. 39 (quotation marks omitted). The New Jersey Supreme Court has observed that "[s]eeking truthful, accurate, and non-tainted testimony certainly is the objective of every litigated case." *Loigman*, 889 A.2d at 429-31, 437. How then can calculated false and misleading statements serve the truth-seeking function of the litigation? According to the complaint, BASF and Cahill were not mischaracterizing the facts; they were creating them.

Finally, the New Jersey Supreme Court has never immunized systematic fraud designed to prevent a fair proceeding. Neither have the trial or intermediate courts of New Jersey. In *Ruberton v. Gabage*, the cornerstone of BASF and Cahill's assertion that the privilege extends to all fraud torts, the New Jersey Superior Court, Appellate Division, applied the privilege to a party's claim that he had been induced to settle by tortious threats of his adversary's lawyer. 654 A.2d 1002, 1004-05 (N.J. Super. Ct. 1995). But the Appellate Division described the issue on appeal as whether the threat "constitutes a malicious abuse of process" and, after concluding it did not, alternatively held that the litigation privilege would bar the claim. *Id.* Nothing in *Ruberton* persuades us that New Jersey's Supreme Court would insulate BASF, Cahill, or future defendants like them, from liability. Neither does anything in *Wately v. Shaler*, also relied on by defendants. *See* 2013 WL 5299499 (N.J. Super. Ct. Sept. 23, 2013). In that unpublished opinion, the New Jersey Superior Court, Appellate Division, affirmed the dismissal of a lawsuit brought by a former criminal defendant against the expert witness he had retained. *Id.* at *1. The privilege applied to defeat the claim that the criminal defendant had been misled by the expert because the expert's trial testimony did not match his pre-trial description of how he intended to testify. *Id.* at *1-2. *Watley* might create a basis for immunizing the expert witnesses who filed affidavits in plaintiffs' asbestos-injury cases. It does not extend immunity to those who manipulate their adversaries in and out of court over a period of decades.

Williams has pled a claim for fraud. The viability of that claim turns on whether New Jersey would extend its litigation privilege to a claim of fraud directed at the integrity of the judicial process. Based on the policies underlying the privilege and the New Jersey cases applying it, we conclude that New

Jersey's Supreme Court would not extend the privilege to the fraud claim alleged here. Accordingly, we reverse the District Court's dismissal of this claim.

**C. *The Complaint alleges a plausible claim for fraudulent concealment.***

The District Court erred when it concluded that Williams had not alleged a plausible claim for fraudulent concealment. Williams's claim rests on well-pled factual allegations.

**1. *Standard***

In law, spoliation refers to "the hiding or destroying of litigation evidence, generally by an adverse party." *Rosenblit v. Zimmerman*, 766 A.2d 749, 754 (N.J. 2001) New Jersey courts oppose it: "Such conduct cannot go undeterred and unpunished and those aggrieved by it should be made whole with compensatory damages and, if the elements of the Punitive Damages Act are met, punitive damages for intentional wrongdoing." *Id.* at 758 (citation omitted).

New Jersey permits plaintiffs to recover in an independent action for harm caused in a prior proceeding by an adversary's spoliation: "[T]he tort of fraudulent concealment, as adopted, may be invoked as a remedy for spoliation where those elements exist." *Id.*

To prove the tort, a plaintiff must establish five elements:

(1) The defendant had a legal obligation to disclose evidence in connection with an existing or pending litigation;

(2) the evidence was material to the litigation;

(3) the plaintiff could not reasonably have obtained access to the evidence from another source;

(4) the defendant intentionally withheld, altered, or destroyed the evidence with purpose to disrupt the litigation; and

(5) the plaintiff was damaged in the underlying action by having to rely on an evidential record that did not contain the evidence defendant concealed.

*Id.*

### 2. *Analysis*

Williams has alleged the first four elements of a spoliation claim: As early as 1979, BASF faced actual or threatened litigation over asbestos injuries caused by its products. BASF, and its lawyers at Cahill, anticipated additional lawsuits in the future. BASF possessed evidence that its talc products contained asbestos, including assays, lab notes, and testimony. Williams could not have accessed the evidence—most of which was held exclusively by BASF and Cahill—through any other means. And, Williams now claims, rather than maintain the evidence, BASF and Cahill concealed or destroyed it. Taken together, these facts, if proven, establish that BASF and Cahill intentionally destroyed or withheld material evidence that they were duty-bound to disclose and that their adversaries could not otherwise access. *Cf. Rosenblit*, 766 A.2d at 758.

The parties dispute whether Williams has alleged the fifth element of the spoliation claim, that she was "damaged in the underlying action by having to rely on an evidential record that did not contain the evidence defendant concealed." *Id.* BASF and Cahill contend that this element requires plaintiffs to demonstrate that they would have prevailed in the underlying action. Accepting this argument, the District Court determined that

26

> [t]here is no indication at all in the Amended Complaint that it was a lack of access to the allegedly destroyed evidence which resulted in the termination of Plaintiffs' claims before obtaining a favorable verdict against BASF or in the settlement of such claims for amounts that did not fairly and sufficiently compensate Plaintiffs' decedents for their injuries.

App'x 30.

We believe the bar was set too high. New Jersey courts have explained that a spoliation injury may exist when the conduct affects the size or existence of a damages award at trial. *See Tartaglia v. UBS PaineWebber Inc.*, 961 A.2d 1167, 1190 (N.J. 2008). The injury may also take the form of expenses incurred to litigate the case without the spoliated evidence. *See id.* And a plaintiff may recover "whether [the] plaintiff succeeds on the claim in the original litigation or not"; indeed, a plaintiff may succeed in the underlying case and nevertheless bring a later spoliation claim. *See id.*; *Robertet Flavors, Inc. v. Tri-Form Const., Inc.*, 1 A.3d 658, 671 (N.J. 2010).

In addressing this issue, the District Court looked to a 1998 district court opinion that predicted that the New Jersey Supreme Court would not allow an affirmative cause of action for intentional spoliation, *Larison v. City of Trenton*, 180 F.R.D. 261, 266 (D.N.J. 1998). The New Jersey Supreme Court has since authorized tort recovery for intentional spoliation.

*See Rosenblit*, 766 A.2d at 758. Moreover, when it did so, the New Jersey Supreme Court did not adopt the strict causation and damages theories propounded by *Larison*. *Compare Larison*, 180 F.R.D. at 266 (predicting that a prima facie case could not be established unless and until the plaintiff shows that he failed to prove his original case because of the missing evidence), *with Tartaglia*, 961 A.2d at 1190 (holding by New Jersey Supreme Court that a plaintiff may recover from a spoliator even if the plaintiff prevails in the original suit). Accordingly, plaintiffs did not have to allege facts to show that they "would have succeeded in proving their asbestos injury claims against BASF," as the District Court held, App'x 36, but rather facts to show that BASF and Cahill's destruction of evidence harmed their case.

Plaintiffs' allegations that they received diminished recovery, that their lawsuits were impaired, and that they expended time and money to attempt to litigate around the spoliated evidence, whether singly or in combination, suffice to complete the concealment claim. Plaintiffs allege "that they were materially hampered, impaired and prevented from proving their claims that BASF's and its predecessor companies' talc ore and talc products contained asbestos and proximately caused their underlying asbestos injury." Compl. ¶ 337. Plaintiffs allege that their personal injury suits suffered as a result of the concealed and destroyed evidence—they settled cases on unfavorable terms, decided not to bring cases that appeared to be meritless, or failed to sustain cases for lack of proof that BASF's products contained talc. Additionally, plaintiffs allege that they have "incurred pecuniary losses and damages" due to BASF and Cahill's conduct, including "the expenses and costs of proceeding without" the spoliated evidence and "the expenses and costs incurred in the effort to replace, locate, or identify evidence." Compl. ¶ 340. Taken

together, these allegations, if proven, demonstrate that plaintiffs were "damaged in the underlying action by having to rely on an evidential record that did not contain the evidence defendant concealed." *Rosenblit*, 766 A.2d at 758.

We disagree with BASF and Cahill that plaintiffs allegations are "conclusory and implausible." *See, e.g.*, Cahill Br. 46. As a motion to dismiss, the Court takes as true "well-pleaded factual allegations" and, after doing so, "determine[s] whether they plausibly give rise to an entitlement to relief." *Great W. Mining & Mineral Co.*, 615 F.3d at 177 (quoting *Iqbal*, 556 U.S. at 679).

Commonsense and judicial experience underscore the plausibility of Williams's claims. Williams alleges that in the asbestos-injury lawsuit, BASF and Cahill concealed, destroyed, and lied about the presence of asbestos in their products. What could be more important to a claim that talc caused asbestos disease than proof that the talc contained asbestos? True, even with that evidence, Williams still had other elements to prove. All other things equal, however, Williams's case against BASF would have been much stronger if she had evidence that BASF's products contained asbestos. Moreover, the complaint contains allegations that Williams incurred costs and expenses attempting to litigate around the missing evidence. That allegation is not a legal conclusion but rather a fact from which one could conclude that Williams was harmed in her underlying case.

The allegations are not rendered implausible by reference to the conduct of the plaintiffs' lawyers in the underlying suit, as defendants argue. The crux of this theory is that plaintiffs' lawyers did not actually believe BASF's representations that its products did not contain asbestos and thus their clients could not have relied on those representations. For example,

29

notwithstanding the fact that BASF represented to Williams's lawyers that its products did not contain talc, Williams's lawyers filed subsequent asbestos-injury cases against BASF on behalf of other plaintiffs. Thus, according to BASF and Cahill, plaintiffs could not have relied on the misstatements in prosecuting their cases because their lawyers did not rely on them.

We do not accept this argument. First, plaintiffs' lawyers are not the plaintiffs themselves. A plaintiff, not his or her lawyer, must decide whether to initiate litigation or to end it. *See, e.g.*, N.J. Rules of Professional Conduct 1.2(a). So whatever a lawyer does on behalf of another client proves little, if anything, about the beliefs of a different client. Second, this is a motion to dismiss. Courts must accept as true the plaintiffs' allegations and draw inferences in the plaintiffs' favor. Inferring from plaintiffs' choice of counsel unfavorable facts about plaintiffs' beliefs runs contrary to this rule. Third, as noted, the tort of spoliation requires a plaintiff to prove he or she was harmed in the underlying action by having "to rely on an evidential record that did not contain the evidence defendant concealed." *Rosenblit*, 766 A.2d at 758. The tort does not require reliance on an adversary's representations. Indeed, a lawyer or litigant who destroys or conceals evidence may be liable even if he or she makes no representations to his or her adversaries at all.

In sum, the plaintiffs have alleged far more than a "sheer possibility" that BASF and Cahill injured them. *Cf. Iqbal*, 556 U.S. at 678. Indeed, the complaint states enough facts regarding the consequences of defendants' spoliation that it has raised "a reasonable expectation that discovery will reveal evidence" that plaintiffs have been harmed by BASF and

Cahill's misconduct. *See id.* Accordingly, we reverse the District Court's dismissal of this claim.

### D. *The Complaint does not allege an actionable claim for N.J. RICO.*

The District Court correctly dismissed Williams's N.J. RICO claim. Williams contends that BASF and Cahill injured her by operating a RICO enterprise and by conspiring to operate a RICO enterprise. Because Williams and the other plaintiffs have not alleged that they suffered an injury to their property, as they must, we affirm.

#### 1. *Standard*

In New Jersey, it is unlawful "to conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of racketeering activity." N.J. Stat. § 2C:41-2(c). The New Jersey RICO statute also forbids a person from conspiring to do the same. N.J. Stat. § 2C:41-2(d). Further, New Jersey confers a private right of action on "any person damaged in his business or property by reason" of a RICO violation. N.J. Stat. § 2C:41-4. Accordingly, those injured by racketeering activity may recover in civil actions.

#### 2. *Analysis*

New Jersey courts have not decided whether interference with the litigation of personal injury claims amounts to an injury to "business or property" within the meaning of New Jersey's RICO statute, N.J. Stat. § 2C:41-4. We believe that the New Jersey Supreme Court would not construe "business or property" to include interference with the litigation of personal injury claims.

Injuries to one's business or property differ from injuries to one's person. Thus, in construing the federal RICO law, this Circuit has rejected the argument that personal injuries qualify as RICO injuries to "business or property." *See, e.g.*, *Maio v. Aetna, Inc.*, 221 F.3d 472, 483, 492 (3d Cir. 2000). That said, Williams does not contend that the asbestos injury gives rise to a RICO claim, but rather that BASF interfered with her attempt to recover for the earlier personal injury. Under New Jersey law, this difference does not save the claim. New Jersey's Appellate Division has observed that "an inchoate personal injury claim, unlike some other rights to sue, is not a property right." *Amato v. Amato*, 434 A.2d 639, 642 (N.J. Super. Ct. 1981). Indeed, "[t]he nonassignability of a right of action for tortious personal injury, because it is not a property right, is an ancient concept of the common law recognized in [New Jersey]." *Id; see also Landwehr v. Landwehr*, 545 A.2d 738, 742-44 (N.J. 1988) (deciding that personal injury awards for pain, suffering, and disability were not marital property eligible for distribution in divorce).

Because unliquidated personal injuries claims are not "property" in New Jersey, interference with a personal injury claim does not constitute an actionable harm under New Jersey's RICO statute. The parties point to no New Jersey state court decision that uses a broader definition of property for New Jersey's RICO's statute than used in *Amato*. And just as the words "business or property" have "restrictive significance" in the federal civil RICO statute, *see Maio*, 221 F.3d at 483, so too do these words narrow the types of injuries contemplated by New Jersey's statute.

Because Williams has not alleged an injury to "business or property" as required by N.J. RICO, we affirm the District Court's dismissal of the N.J. RICO claim.

### E. *The claims against the individual defendants.*

Glenn Hemstock, Arthur A. Dornbusch, II, and Thomas Halket, former Engelhard employees, separately contend that the complaint should be dismissed as to them. In addition to joining the other defendants' arguments for dismissal, they argue that the complaint has failed "to state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The District Court, having dismissed the complaint on other grounds, never considered these theories. Because the parties have not focused on them on appeal, we decline to decide them in the first instance.

We do, however, reject the argument raised by Thomas D. Halket that his innocence compels dismissal. That argument rests on three assertions: First, Halket "separated from the company in 1986, years before the plaintiffs even filed their lawsuits." Hr'g Tr. 105:09-11 (March 13, 2014). Second, Engelhard did not conceal any evidence during the only asbestos litigation that occurred during Halket's tenure. Third, "it's only what happened later in litigation that was filed years after he left the company that . . . the company's conduct becomes even arguably problematic." Tr. 106:17-20.

To accept Halket's argument, however, is to reject the factual allegations of the complaint. Plaintiffs have alleged that Halket organized the effort to conceal and destroy evidence after the *Westfall* case. Though Halket may have ended his employment with Engelhard, the Complaint, construed in the light most favorable to Williams, does not support the further inference that Halket bears no responsibility for what he set in motion. Of course, discovery may exonerate Halket and, in any event, he will have the opportunity to contest the truth of those allegations in a later stage of the lawsuit. But on a motion to dismiss, a court may not accept a defendant's factual

33

representations that he has been wrongly accused when the plaintiff has averred otherwise. *See* Fed. R. Civ. P. 8(a).

Accordingly, we may not look past the pleadings to affirm the dismissal of the claims against Halket. We leave it for the District Court to determine whether the remaining fraud and fraudulent concealment claims have been particularly pled against Halket, Hemstock, and Dornbusch.

## IV. Relief

The final issue on appeal concerns the appropriateness of Williams's requested relief. Recall that Williams requested a wide variety of relief, ranging from an injunction against further spoliation to a declaration that, in future cases, the statute of limitations would not bar plaintiffs from recovery. The District Court decided that certain of Williams's requested relief created jurisdictional or justiciability problems. The District Court dismissed Williams's request for declarations, injunctions, rulings, or "orders intended to impact Plaintiffs' ability to pursue as-yet unfiled claims." App'x 25. The District Court reasoned that the Anti-Injunction Act barred it from entertaining much of the requested relief because it invited the District Court to interfere with past lawsuits. In the alternative, and specifically with respect to declarations or injunctions that might affect future lawsuits, the District Court concluded that it lacked a case or controversy to adjudicate.

We consider both the District Court's Anti-Injunction Act ruling and its decision regarding justiciability.

### A. *The Anti-Injunction Act*

The Anti-Injunction Act limits the power of federal courts to interfere with state court proceedings:

> A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

28 U.S.C. § 2283. "The statute . . . 'is a necessary concomitant of the Framers' decision to authorize, and Congress' decision to implement, a dual system of federal and state courts.'" *Smith v. Bayer Corp.*, 131 S. Ct. 2368, 2375 (2011) (quoting *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 146 (1988)). As such, the statute is designed to "forestall the inevitable friction between the state and federal courts that ensues from the injunction of state judicial proceedings by a federal court." *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 630 (1977).

The District Court viewed the Anti-Injunction Act as a bar to "the Court's very power over th[e] action" and, therefore, considered its application from the outset. App'x 19. It need not have done so. While the Act constrains federal courts, "[t]he Act is not strictly jurisdictional; it merely deprives the federal courts of the power to grant a particular form of equitable relief." *Gloucester Marine Ry. Corp. v. Charles Parisi, Inc.*, 848 F.2d 12, 15 (1st Cir. 1988) (citing *Smith v. Apple*, 264 U.S. 274, 278-79 (1924)). Thus, the Anti-Injunction Act would be an appropriate basis for dismissal only insofar as it barred Williams from stating a claim upon which relief could be granted.

The Anti-Injunction Act does not bar Williams's requested relief. The Act applies to a narrow set of circumstances:

35

"[W]hen (1) a court of the United States (2) grants an injunction (3) to stay proceedings (4) in a state court." *U.S. Steel Corp. Plan for Emp. Ins. Benefits v. Musisko*, 885 F.2d 1170, 1175 (3d Cir. 1989). Those circumstances do not exist here because there are no ongoing proceedings in a state court with which the District Court's judgment would interfere. Accordingly, § 2283 "has no application."[3] Thus, while the Supreme Court has admonished that "[p]roceedings in state courts should normally be allowed to continue unimpaired by intervention of the lower federal courts," the named plaintiffs in this case have no other proceedings pending anywhere. *See Atl. Coast Line R.R. v. Brotherhood of Locomotive Eng'rs*, 398 U.S. 281, 287 (1970). Perhaps in the future the parties to this case will return to state court in an effort to reactivate their concluded proceedings. But they have not yet done so, and the Act aims to avoid "needless friction between state and federal courts" not to prevent a district court from deciding issues that

---

[3] 17A CHARLES ALAN WRIGHT, ET AL., FED. PRAC. & PROC. § 4222 (3d ed. 1998); *see also Dombrowski v. Pfister*, 380 U.S. 479, 484 n.2 (1965) (noting that Anti-Injunction Act does "not preclude injunctions against the institution of state court proceedings, but only bar[s] stays of suits already instituted"); ERWIN CHEMERINSKY, FEDERAL JURISDICTION 768 (6th ed. 2012) ("[T]he act applies only if there are proceedings actually pending in the state courts; it does not prevent federal courts from issuing injunctions in the absence of ongoing state court litigation."); LARRY W. YACKLE, FEDERAL COURTS 492 (3d ed. 2009) (The Act "protects judicial proceedings only if they are already pending when a federal court is asked to take action.").

may affect future state court litigation. *See Okla. Packing Co. v. Okla., Gas & Elec. Co.*, 309 U.S. 4, 9 (1940).

Acknowledging that no state court proceedings are currently pending, BASF and Cahill assert that the Anti-Injunction Act further prohibits the District Court from acting to "deprive [past] state-court judgments of legal significance." (BASF Br. 18.) None of the decisional law cited by BASF and Cahill supports this argument.

First, in *Hill v. Martin*, cited by BASF, a pre-New Deal Supreme Court opined that the Anti-Injunction Act "applies not only to an execution issued on a judgment, but to any proceeding supplemental or ancillary taken with a view to making the suit or judgment effective." 296 U.S. 393, 403 (1935) (footnote omitted). That comment appears to address which types of state court proceedings may not be enjoined. (The answer: any type.) But *Hill* does not constrain the District Court because this case does not feature ongoing state court proceedings of any type.

Second, BASF and Cahill reference *Atlantic Coast Line* for the idea that the district courts may not sidestep the Anti-Injunction Act by preventing the parties from using "the results of a completed state proceeding." 398 U.S. at 287. *Atlantic Coast Line* did not, however, expand the Act to circumstances, like this one, where the named plaintiffs have no ongoing state court cases. Rather, *Atlantic Coast Line* focused on the impropriety of a federal court nullifying an active and continuing state-court order. *Id.* Neither BASF nor Cahill has identified any active orders from the asbestos-injury suit. To the contrary, it appears that those cases simply ended with dismissals. Accordingly, *Atlantic Coast Line* does not constrain the District Court because there are no continuing state court orders with which the District Court could interfere.

37

Third, in *U.S. Steel*, also cited by BASF and Cahill, this Court disapproved of a district court's declaratory judgment that conflicted with a state appellate court's ruling on the same issue between the same parties. *See* 885 F.2d at 1176. The panel reasoned that "[t]he practical result of the district judge's order . . . was to cast doubt on the effectiveness of the [state appellate court's] ruling and on any judgment that might result from it." *Id.* at 1175. Unlike this case, however, *U.S. Steel* involved ongoing state litigation. The case there had traveled from the state trial court to the appellate court and back again, and the federal court intervened in the midst of the remand. Thus, "[t]he district court's order could [have] effectively prevent[ed] the state trial judge from proceeding in accordance with the Superior Court's direction." *Id.* The District Court's orders in this case could not have such an effect because the state court litigation ended long ago.

At bottom, BASF and Cahill appear to construe § 2283 to forbid federal courts from criticizing completed state proceedings. The statute enshrines no such rule. Of course, as defendants themselves note, a state-court loser may not appeal his judgment to a federal district court. *See Lance v. Dennis*, 546 U.S. 459, 464 (2006) (discussing *Rooker-Feldman* doctrine). But § 2283 does not purport to displace doctrines, such as res judicata, that might guide a federal court's analysis of the effect to be given a past ruling of a state court. It cannot be, as BASF and Cahill imply, that when a federal court decides that the claim before it has not been precluded by a prior state court judgment, it has thereby violated the Anti-Injunction Act by limiting the effect of the prior state court judgment. Nor can it be that when a new federal suit seeks redress for harms suffered during old state proceedings, but not because of them, the Anti-Injunction Act stands in a federal

court's way. To use the Anti-Injunction Act in this way would be new, burdensome, and incorrect.

### B. *Justiciability*

In the alternative, the District Court concluded that Williams could not obtain certain declaratory and injunctive relief because she had not presented the court with a justiciable controversy. With respect to the relief targeted at solely legal issues anticipated in future cases, we affirm.

A plaintiff must establish a justiciable case or controversy with respect to each form of relief he or she seeks. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102-03 (1983). Thus, even when a plaintiff has a claim for damages, in order to obtain prospective relief, he or she must establish standing to do so. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 210-11 (1995); *see also* 28 U.S.C. § 2201 (Declaratory Judgment Act remedies). "To have standing to sue under Article III," a plaintiff must identify "(1) a cognizable injury that is (2) causally connected to the alleged conduct and is (3) capable of being redressed by a favorable judicial decision." *Pa. Family Institute, Inc. v. Black*, 489 F.3d 156, 165 (3d Cir. 2007)*; Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992)). Moreover, the judicial power does not extend to hypothetical disputes, and federal courts may not "give opinions advising what the law would be upon a hypothetical state of facts." *Chafin v. Chafin*, --- U.S. ----, 133 S. Ct. 1017, 1023 (2013) (alterations and quotation marks omitted). And in order to be justiciable, a claim must be ripe for review. *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 732-33 (1998).

We see two defects in William's requested relief.

First, Williams runs afoul of the rule that "a litigant may not use a declaratory-judgment action to obtain piecemeal

adjudication of defenses that *would not finally and conclusively resolve* the underlying controversy." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 n.7 (2007). Williams requests declarations (or injunctions) determining rights and defenses available to BASF and Cahill in future proceedings. This relief, however, invites the District Court to wade into a legal conflict that is not before it—the viability of a particular plaintiff's asbestos-injury claim against BASF. Under Article III, plaintiffs may not seek a judgment that "would merely determine a collateral legal issue governing certain aspects of their pending or future suits." *Calderon v. Ashmus*, 523 U.S. 740, 747 (1998). A declaration from the District Court about the preclusive effect of past judgments, for example, might determine whether BASF's past judgments were "valid" and, therefore, preclusive. *See, e.g.*, *Mortgagelinq Corp. v. Commonwealth Land Title Ins. Co.*, 662 A.2d 536, 346 (N.J. 1995) (noting that a judgment must be valid and final in order to have preclusive effect). But that declaration would not decide BASF's liability to a particular plaintiff for a particular asbestos injury. In this way, Williams's request resembles that of a prisoner who sued to prevent the state from invoking an affirmative defense in an anticipated, but unfiled, § 1983 claim. *Ashmus*, 523 U.S. at 747-59. In this case and in that one, the plaintiff asks the trial court to determine in part what would be litigated in full on a later date.

Second, and relatedly, issues that may arise in state court asbestos-injury litigation are not ripe for review. BASF and Cahill have not asserted any defenses to plaintiffs' asbestos-injury claims and, in fact, the named plaintiffs to this suit have not brought any such claims. We see no hardship to parties imposed by refusing to answer these questions now, as plaintiffs likely will not face state court defenses until they file or seek to re-active their state court cases. Moreover, these

questions are abstact at this stage. The identity of the parties, the nature of the claims and defenses, and the substantive law to be applied are all unknown. Thus, although the parties certainly have adverse interests on these matters, an injunction or declaration about future legal defenses would not provide a conclusive resolution of an existing controversy. The issues are, therefore, unripe. *See Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1299-1300 (3d Cir. 1996); *see also MedImmune, Inc.*, 549 U.S. at 128 n.8 (observing that these sorts of justiciability problems may be characterized as problems of either "standing" or "ripeness").

We conclude that Williams may not seek in this suit a determination of a legal issue anticipated in subsequent proceeding. Accordingly, we affirm the District Court's dismissal of Williams's claims to declaratory or injunctive relief to the extent Williams seeks to enjoin BASF and Cahill from invoking res judicata, laches, statute of limitation doctrines, or other similar issues, in future proceedings before other courts. That said, we see no constitutional barrier to the District Court ordering a notice program or enjoining defendants from further spoliation if the proofs warrant the relief.

## V. Conclusion

The District Court dismissed each of Williams's claims, including the N.J. RICO, fraud, and fraudulent concealment claims contested here. With respect to the fraud and fraudulent concealment claims, the District Court erred. The New Jersey litigation privilege does not immunize systematic fraud directed at adversarial parties and the courts. The tort of fraudulent concealment, which encompasses claims of spoliation, does not require Williams to prove that she would

41

have prevailed on the merits of her asbestos-injury case. The alleged facts of harmful reliance suffice to state the claim.

With respect to the District Court's conclusion that it would be unable to order Williams's requested relief, we reverse in part and affirm in part. To the extent that Williams's relief invites the District Court to decide matters to be raised in other litigation, Williams has not presented a justiciable controversy for which that relief would be appropriate. To the extent that Williams seeks remedies for the alleged fraud and spoliation, including declaratory and injunctive relief, the District Court is not barred by the Anti-Injunction Act from providing them.

We remand for further proceedings. We also direct the parties to inform the District Court of any developments in state court proceedings that might be pertinent to the exercise or abstention of its jurisdictional authority.